1
2
3
4
5

LOUIS N. BOYARSKY (#263379)
GLANCY PRONGAY & MURRAY LLP
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:   (310) 201-9150
Facsimile:   (310) 201-9160
Email:        LBoyarsky@glancylaw.com

6
7
8
9
10

ROBERT I. HARWOOD
MATTHEW M. HOUSTON
BENJAMIN I. SACHS-MICHAELS
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
(212) 935-7400

11

*Attorneys for Plaintiff*

12

UNITED STATES DISTRICT COURT

13

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

14

15
16
17
18

SHIVA Y. STEIN, Derivatively on
Behalf of Nominal Defendant EDISON,
INC.,

                        Plaintiff,

        v.

19
20
21
22
23

THEODORE F. CRAVER, JR.,
JAGJEET S. BINDRA, VANESSA C.
L. CHANG, RICHARD
SCHLOSBERG, III, LINDA G.
STUNTZ, ELLEN O. TAUSCHER,
PETER J. TAYLOR, and BRETT
WHITE,

                        Defendants,

24
25

        and

26
27
28

EDISON INTERNATIONAL,

                        Nominal Defendant.

Case No.:   **'15CV1581 AJB  RBB**

**VERIFIED SHAREHOLDER
DERIVATIVE COMPLAINT FOR
BREACH OF FIDUCIARY DUTY,
ABUSE OF CONTROL, AND
VIOLATIONS OF SECTION 14 OF
THE SECURITIES EXCHANGE
ACT OF 1934**

**DEMAND FOR JURY TRIAL**

Plaintiff Shiva Y. Stein ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Edison International ("Edison" or the "Company"), against certain members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, abuse of control, and violations of § 14 of the Securities Exchange Act of 1934.

## NATURE AND SUMMARY OF THE ACTION

1. Edison International, through its wholly-owned subsidiary, Southern California Edison Company ("SCE"), generates and supplies electricity throughout Southern California in a service area containing approximately 14 million people. This action arises out of recent revelations that Edison, over a period of years, repeatedly, secretly, and improperly attempted to influence California state regulators in a multi-billion dollar regulatory proceeding. It has now been revealed that due to this secret lobbying, Edison obtained a settlement of the regulatory proceeding that was many hundreds of millions of dollars more favorable to it, and less favorable to California consumers, than if the secret lobbying efforts were known. The Company now faces the prospect of hundreds of millions of dollars in additional liability, costs, legal fees, and potentially even criminal liability due to this wrongdoing.

2. For decades, Edison was the majority owner of a nuclear electricity generating facility in San Diego County, California, called the San Onofre Nuclear Generating Station ("SONGS"). In the early 2000s, Edison commenced a plan to replace the steam generators in two reactor units at SONGS. As detailed more fully below, the replacement project was a complete failure and only 11 months after the nearly $5 billion project went online, it was permanently closed due to faulty design which led to a radiation leak.

3. This debacle caused the California Public Utilities Commission ("CPUC") to institute a proceeding to investigate and determine who should bear

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1    the enormous costs associated with the construction of the new steam generators,

2    the process of shuttering them, and the provision of replacement electricity when

3    SONGS could no longer produce.  Edison, as a public utility had the right, under

4    certain circumstances, to make California ratepayers cover some of the costs it had

5    incurred.  However, consumer advocacy groups argued that ratepayers should not

6    bear the costs related to the poor design of the facility.

7        4.    After a long multiparty proceeding before the CPUC, the parties

8    agreed to a final settlement in November 2014.  The settlement agreement is

9    complex, but it generally provides that Edison may recoup approximately $3.3

10   billion in costs from ratepayers but it will provide approximately $1.4 billion in

11   relief to ratepayers through discounts and rebates.

12       5.    However, in February 2015, it began to be revealed that throughout

13   the SONGS proceeding, Edison had engaged in a systematic effort to influence the

14   outcome before the CPUC through undisclosed *ex parte* contacts with CPUC

15   personnel.  Although Edison was required to report the times, dates, and substance

16   of all *ex parte* contacts with CPUC personnel during which the SONGS proceeding

17   was discussed, it had not reported dozens of such contacts going back years.  In

18   particular, one of these contacts involved a meeting at a hotel in Warsaw, Poland,

19   during which a Southern California Edison employee conducted a detailed

20   substantive discussion with the then-president of the CPUC related to how the

21   Company could obtain the best outcome in the SONGS proceeding.  This contact

22   was so detailed that when, at a later date, a search warrant was executed on the

23   home of the former CPUC president, investigators found a multi-page copy of

24   notes from the Warsaw meeting including even dollar amount estimates for

25   potential settlement written by the regulator.

26       6.    In response to the February 2015 disclosures, certain consumer

27   advocacy organizations and parties to the settlement moved the CPUC to sanction

28   Edison and reopen the settlement because, among other things, it was fraudulently

2

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

procured in violation of CPUC rules.  As alleged in detail below, these parties argue that had the *ex parte* contacts been reported as they were required to be, the settlement terms would have been materially different and Edison could be required to contribute approximately $500 million to $1 billion more to the cost of the settlement.  At least one securities class action has been filed against the Company in connection with these revelations and the California Attorney General has reportedly executed multiple search warrants against the Company, at least one of which involved a search of Edison's headquarters.

7.     In short, not only is Edison now confronting the possibility of substantial new liability in the SONGS proceeding before the CPUC, but it is also subjected to additional new liabilities due to its failure to comply with legal requirements and report *ex parte* contacts in a timely and complete manner. Further, because of the allegations of fraud and corruption in obtaining the SONGS settlement, regardless of whether the CPUC reopens the settlement or not, the Company will now face legal challenges to the settlement before the CPUC and in state and federal courts for the foreseeable future at significant cost.

8.     Plaintiff has not made a demand on the Board of Edison because a majority of the Individual Defendants (defined herein) is complicit in the wrongdoing as alleged in detail below.  The *ex parte* communications reached the highest level of Edison, including its Chief Executive Officer ("CEO").  Indeed, half of the Company's outside directors had actual knowledge of undisclosed improper *ex parte* communications as far back as 2013, and not only permitted the Company to conceal them, but as evidence detailed below demonstrates, declined to even implement a Company policy covering *ex parte* contacts until well after the damage had been done.  The Individual Defendants have all breached their fiduciary duties to Edison in connection with the wrongdoing alleged herein to the very serious detriment of the Company.  As a result, demand on the Edison Board is excused because it would be futile.

**JURISDICTION AND VENUE**

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Securities Exchange Act of 1934.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

10.      Additionally, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that Plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.  Plaintiff is a citizen of New York and no defendant is a citizen of that state.

11.      Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of Defendants resides in this District, the Company maintains its principal executive offices in this District, Defendants have received substantial compensation in this district by engaging in activities that had an effect in this district and are directly related to the wrongdoing alleged herein.

**PARTIES**

**A.     Plaintiff**

12.      Plaintiff is a shareholder of Edison, has been since prior to settlement of the SONGS proceeding in November 2014 and continues to be.

**B.     Defendants**

13.      Nominal defendant Edison is an entity incorporated under the laws of the State of California, which maintains its principal executive offices at 2244 Walnut Grove Avenue, Rosemead, California 91770.  Edison, through its subsidiaries, generates and supplies electricity.  The Company generates electricity through hydroelectric, diesel, natural gas, nuclear, and photovoltaic sources.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

14.     Defendant Theodore F. Craver ("Craver") has served as Edison's CEO and President, and the Chairman of the Board since 2008.  Defendant Craver has served as a director of Edison since 2007 and of Southern California Edison since 2008.   Upon information and belief, defendant Craver is a citizen of California.

15.     Defendant Jagjeet S. Bindra ("Bindra") has served as a director of Edison and Southern California Edison since 2010.  At relevant times, defendant Bindra was a member of the Audit Committee and the Finance, Operations & Oversight Committee.[1]  Upon information and belief, defendant Bindra is a citizen of California.

16.     Defendant Vanessa C. L. Chang ("Chang") has served as a director of Edison and Southern California Edison since 2007.  At relevant times, defendant Change was the Chair of the Audit Committee and a member of the Compensation & Executive Personnel Committee.  Upon information and belief, defendant Chang is a citizen of Texas.

17.     Defendant Richard T. Schlosberg, III ("Schlosberg") has served as a director of Edison and Southern California Edison since 2002.  At relevant times, Defendant Schlosberg was a member of the Compensation & Executive Personnel Committee and is the Chair of the Nominating/ Corporate Governance Committee. Upon information and belief, defendant Schlosberg is a citizen of Texas

18.     Defendant Linda G. Stuntz ("Stuntz") has served as director of Edison and Southern California Edison since 2014.  At relevant times, defendant Stuntz was a member of the Finance, Operations & Safety Oversight Committee and the Nominating/ Corporate Governance Committee.   Upon information and belief, defendant Stuntz is a citizen of Virginia.

---

[1]     According to the Company's public filings, the committee composition is the same for both Edison and Southern California Edison boards, and the committees of each board met the same number of times in 2014.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

19.   Defendant Ellen O. Tauscher ("Tauscher") has served as a director of Edison and Southern California Edison since 2013.  At relevant times, defendant Tauscher was a member of the Audit Committee and the Finance, Operations & Safety Oversight Committee.  Upon information and belief, defendant Tauscher is a citizen of Washington, D.C.

20.   Defendant Peter J. Taylor ("Taylor") has served as a director of Edison and Southern California Edison since 2011.  At relevant times, defendant Taylor was a member of the Audit Committee and the Compensation & Executive Personnel Committee.  Upon information and belief, defendant Taylor is a citizen of California.

21.   Defendant Brett White ("White") has served as a director of Edison and Southern California Edison since 2007 and as Lead Director since 2014.  At relevant times, defendant White was the Chair of the Compensation & Executive Personnel Committee and a member of the Nominating/ Corporate Governance Committee.   Upon information and belief, defendant White is a citizen of California.

22.   The defendants named in ¶¶ 14 - 21 are referred to herein as the "Individual Defendants."[2]

**DEFENDANTS' DUTIES**

23.    By reason of their positions as officers, directors, and/or fiduciaries of Edison and because of their ability to control the business and corporate affairs of Edison, at all relevant times defendants owed Edison and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage Edison in a fair, just, honest, and equitable manner.  Defendants were required to act in furtherance of the best

---

[2]    Also a member of the Board, but not named as a defendant, is William P. Sullivan ("Sullivan").  Sullivan is not named as a defendant at this time because he joined the Board in mid-April 2015.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

interests of Edison and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Edison and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing

24. Defendants, because of their positions of control and authority as directors and/or officers of Edison, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with Edison, each of the defendants had knowledge of material non-public information regarding the Company

25. To discharge their duties, the officers and directors of Edison were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Edison were required to, among other things:

(a) Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b) Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c) Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(d)     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

### SUBSTANTIVE ALLEGATIONS

Background

26.     The predecessor to Edison was initially incorporated in 1909 as the Southern California Edison Company.  In 1987, Edison was incorporated as the parent holding company of the now-subsidiary, Southern California Edison. Currently, the primary subsidiaries of Edison are Southern California Edison and Edison Energy which pursues business ventures competitive to Southern California Edison in areas related to the provision of elective power and infrastructure, including distributed generation, storage, and power management.

27.     The San Onofre Nuclear Generating Station ("SONGS") is an inoperative nuclear power plant located in San Diego County, California.  SONGS is majority owned 78% by the Company.  SONGS' first unit, Unit 1, operated from 1968 to 1992.  In 1970, Edison estimated the next two units, Unit 2 and Unit 3, would cost $437 million and would commence operation in 1975 and 1976. Ultimately, Unit 2 commenced operating in 1983 and Unit 3 in 1984, at a combined cost of approximately $4.5 billion.

28.     In June 2006, Edison notified the Nuclear Regulatory Commission that it intended to replace the steam generators in Units 2 and 3 at SONGS.  The new steam generators were purportedly going to extend SONGS' operating ability for thirteen years from 2009 to 2022.  Edison obtained the agreement of the CPUC that it could charge ratepayers for the new generators so long as Edison applied to do so six months after SONGS returned to commercial operation.

29.     The two new generators were designed and fabricated between 2004 and 2010.  According to a report on SONGS issued by the Nuclear Regulatory Commission's Office of the Inspector General, in the view of that body's Deputy

Regional Administrator, "the design, as built, was fundamentally flawed and would not have been approved under any conditions.   The overall design was unacceptable…"

30.   Nevertheless, the new steam generators went online in January 2010 and February 2011 and SONGS returned to commercial operation in February 2011.  As a result, Edison was required to file its application to include the cost of the new generators in rates by August 2011.  However the application was not timely filed and, on information and belief, was never filed.

31.   A little less than a year after SONGS returned to commercial operation, on January 31, 2012, the new steam generators failed when Unit 3 presented a possible reactor coolant leak after only 11 months of operation.  Upon examination of Unit 2, it was revealed that its steam generator had also experienced high levels of tube degradation.   This was the end of electricity production at SONGS and in June 2013, Edison certified to the Nuclear Regulatory Commission that it had permanently ceased operations at the facility.

32.   There were enormous costs related to the installation and fabrication of the new steam generators, the work required to put them into "preservation mode" after they failed, and the purchase of power to replace the power lost due to the SONGS outage.   California ratepayers were required to bear some of this expense.  However, the ultimate distribution of these costs was contested.  Various consumer advocacy groups contended that the Company acted imprudently in managing the design of the steam generators and ratepayers should not be responsible to pay for any costs related to the new generators at SONGS at any time, but particularly after January 31, 2012 when Unit 3 failed.  This resulted in a variety of legal actions in courts, before administrative bodies, and in arbitration between, among others, Edison, Mitsubishi, the company that built the steam generators, insurance carriers, and California ratepayers.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

33.   On October 25, 2012, the CPUC issued an Order Initiating Investigation ("OII") initiating a multi-part investigation into the actions and expenses of Edison associated with the SONGS outage.[3]  The investigation was to "consider the causes of the outages, the utilities' responses, the future of the SONGS units, and the resulting effects on the provision of safe and reliable electric service at just and reasonable rates."  The OII identified a range of rate recovery issues to be examined, including "various questions around the costs, viability, and prudency" of the plan to replace the steam generators in Units 2 and 3 at SONGS.

34.   Edison sought full recovery in electricity rates for a wide range of expenses related to SONGS.  The CPUC Administrative Law Judge ordered the Company and other parties to provide testimony and reply testimony regarding: "outage history, historic forecast and actual expenses, 2012 treatment of fuel contracts, reasonableness support for 2012 recorded expenses, calculation of replacement power costs, support for meeting a reasonable or prudent manager standard post-outage, and for production of reports from Nuclear Regulatory Commission and others addressing the cause of the outage."  Participating in this process, in addition to Edison, SCE, and the minority owner of SONGS, San Diego Gas & Electric ("SDG&E"), were the Office of Ratepayer Advocates ("ORA"), The Utility Reform Network ("TURN"), Alliance for Nuclear Responsibility ("A4NR"), World Business Academy, Women's Energy Matters, among others.

35.   The CPUC's investigation and related proceedings continued over years through multiple phases including testimonial and evidentiary proceedings. On March 20, 2014, Edison, SDG&E, TURN, and ORA served a notice of settlement conference to be held on March 27, 2014.  On April 3, 2014, these parties filed and served a motion for adoption of settlement that, if approved, would resolve all issues in the consolidated OII proceedings.  There were,

---

[3]   As used herein, the term "OII" means not only the order initiating investigation, but the related proceedings as well.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  however, parties that opposed the settlement and did not participate in its
2  negotiation.

3        36.    After modifications, this all resulted in a CPUC decision dated
4  November 20, 2014, approving the settlement.  Generally, the complex settlement
5  agreement divides costs into different categories for payment.  The ultimate result
6  was that the utilities (mostly Edison) would refund some funds collected in rates
7  from ratepayers, would recover some costs still outstanding in the rates paid by
8  ratepayers, and some costs would be shared between the utilities and rate payers.
9  Ratepayers would pay more than $3.3 billion for the inoperative plant as a
10  recovery of the undepreciated net investment in SONGS assets.   Under this
11  agreement, ratepayers were to receive refunds and credits of approximately $1.4
12  billion.

13  _Ex parte_ Communications

14        37.    Proceedings before the CPUC, such as those at issue here, are
15  governed by rules of practice and procedure promulgated by the CPUC (the
16  "CPUC Rules").  Article 8 of the CPUC Rules is titled "Communications With
17  Decisionmakers And Advisors."  Rule 8.1 defines an _ex parte_ communication as a
18  written or oral communication concerning any substantive issue in a formal
19  proceeding that takes place between an interested person and a Decisionmaker, and
20  does not occur in a public hearing, workshop, or other public forum.   A
21  Decisionmaker is defined as any Commissioner of the CPUC or Administrative
22  Law Judge.   Rule 8.3 states that in any rate-setting proceeding, _ex parte_
23  communications are subject to the reporting requirements of Rule 8.4, while in any
24  adjudicatory proceeding, _ex parte_ communications are prohibited.  Rule 8.4 states
25  _ex parte_ communications "shall be reported by the interested person," regardless of
26  who initiated the communication and "[n]otice of _ex parte_ communications shall
27  be filed within three working days of the communication."  The disclosure must
28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  include the contents of the communication, its time, place, and date, among other

2  details.

3      38.    At relevant times, Edison's internal controls over *ex parte*

4  communications were deficient to nonexistent.  An example of this is an email sent

5  on September 25, 2014,[4] before the final settlement in November 2014.  The email,

6  sent by the Chief Ethics and Compliance Officer of Edison, Southern California

7  Edison's General Counsel, and Southern California Edison's Senior Vice

8  President, Regulatory Affairs, makes clear that executives, and the Individual

9  Defendants, were aware the CPUC Rules were not being followed.  It states in

10  part: "While we are well aware of the CPUC's *ex parte* communication rules, *this*

11  *situation* makes clear that awareness of the rules is not enough."  (Emphasis

12  added.)  What "this situation" refers to precisely is unclear, but the context makes

13  clear that Edison executives knew the Company's internal controls over *ex parte*

14  were deficient.      However, awareness of the unspecified "situation"

15  notwithstanding, it would be nearly six months before Edison even made a cursory

16  attempt at coming clean.

17      39.    An internal Southern California Edison document dated February 2,

18  2015 titled "Communications and Interactions with the California Public Utilities

19  Commission," further illustrates the complete lack of internal controls over these

20  communications at Edison.[5]  Stunningly, Southern California Edison did not

21  previously have a policy in place regarding *ex parte* communications.  At the top

22  of the document a field regarding the history of the policy states: "Supercedes[:]

23  N/A – New Policy."  The new policy purports to impose requirements that should

24  have been in place all along.  Edison employees were only now prohibited from

25  "[a]ll non-procedural communications with Decisionmakers in adjudicatory

26

27  [4]     This email is an exhibit to a later filing in the SONGS OII.
   [5]     This internal policy document is an exhibit to a later filing in the SONGS
28  OII.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   proceedings," and only now required to "promptly report" any conversation with a

2   Decisionmaker.     The   policy   states   in-person   interactions   with   CPUC

3   Decisionmakers "may only occur during normal business hours or at widely-

4   attended events like seminars."

5   Misleading Statements

6       40.   The relevant period begins on July 31, 2014, when Edison filed with

7   the U.S. Securities and Exchange Commission ("SEC") its Form 10-Q for the

8   second quarter of 2014.  For the quarter, the Company reported net income of $566

9   million, or $1.63 per diluted share, on revenue of $3.02 billion, compared to a net

10  loss of $70 million, or $0.29 per diluted share, on revenue of $3.05 for the same

11  period in the prior year.  The Form 10-Q contained signed certifications pursuant

12  to the Sarbanes-Oxley Act, 15 U.S.C.S. § 7241(a), ("SOX") by defendant Craver

13  stating that the financial information contained in the Form 10-Q was accurate and

14  disclosed any material changes to the Company's internal control over financial

15  reporting.  The 10-Q, the Company stated, in part, that:

16      ***CPUC Proceedings and Proposed Settlement***

17      In October 2012, the CPUC issued an Order Instituting Investigation
        ("OII") that consolidated all San Onofre issues in related CPUC
18      regulatory proceedings to consider appropriate cost recovery for all
        San Onofre costs, including among other costs, the cost of the steam
19      generator replacement project, substitute market power costs, capital
        expenditures, and operation and maintenance costs.
20
        On March 27, 2014, SCE entered into a settlement agreement (the
21      "San Onofre OII Settlement Agreement") with The Utility Reform
        Network ("TURN"), the CPUC's Office of Ratepayer Advocates
22      ("ORA") and SDG&E, which was later joined by the Coalition of
        California Utility Employees ("CUE") and Friends of the Earth
23      ("FOE") (together, the "Settling Parties"). If implemented, the San
        Onofre OII Settlement Agreement will constitute a complete and final
24      resolution of the CPUC's OII and related proceedings regarding the
        Steam Generator Replacement Project ("SGRP") at San Onofre and
25      the related outage and subsequent shutdown of San Onofre. The San
        Onofre OII Settlement Agreement does not affect proceedings before
26      the NRC or proceedings related to recoveries from third parties
        described below, but does describe how shareholders and customers
27      will share any potential recoveries. Implementation of the San Onofre
        OII Settlement Agreement is subject to the approval of the CPUC.
28      The parties to the San Onofre OII Settlement Agreement have agreed

13

to exercise their best efforts to obtain CPUC approval. The San Onofre OII Settlement Agreement is subject to termination by any of the Settling Parties if the CPUC has not approved it within six months of submission, but there can be no certainty of when or what the CPUC will actually decide.

*Disallowances, Refunds and Rate Recoveries*

If the San Onofre OII Settlement Agreement is approved, SCE will not be allowed to recover in rates its capitalized costs for the SGRP as of February 1, 2012 or a return on such investment after such date. As of February 1, 2012, SCE's net book value in the SGRP was approximately $597 million. Additionally, SCE will not be allowed to recover in rates approximately $99 million of incremental inspection and repair costs incurred for the replacement steam generators ("RSGs") in 2012 that were in excess of CPUC-authorized operations and maintenance expense. These costs, net of invoices paid, were previously expensed in SCE's 2012 financial results, although they remain subject to recovery from the supplier of the RSGs. Neither will SCE be allowed to recover in rates provisionally authorized operations and maintenance expense in 2013 that exceeds amounts included in recorded operations and maintenance expense (including severance and incremental repair and inspection costs); such excess had not been recognized in 2013 earnings. Subject to the foregoing, SCE will be authorized to recover in rates its remaining investment in San Onofre, including base plant, materials and supplies, nuclear fuel inventory and contracts and construction work in progress ("CWIP"), generally over a ten-year period commencing February 1, 2012. Additionally, SCE will be authorized to recover in rates its provisionally authorized operations and maintenance expenses for 2012, recorded costs for the 2012 refueling outage of Unit 2, recorded operations and maintenance expenses for 2013, and recorded operations and maintenance expenses for 2014 subject to customary prudency review. Finally, SCE will also be authorized to recover in rates through its fuel and purchased power balancing account ("ERRA") all costs incurred to purchase electric power in the market related to the outage and shutdown of San Onofre, and to recover by December 31, 2015 any San Onofre-related ERRA undercollections. Estimated market power costs through June 6, 2013 (the date of San Onofre's retirement) were approximately $680 million using the methodology followed in the OII. To the extent that amounts otherwise recoverable in rates under the San Onofre OII Settlement Agreement are recovered from SCE's Decommissioning Trust as a decommissioning cost, the amounts otherwise recoverable in rates will be reduced with no impact on earnings.

* * *

*Accounting and Financial Impact*

Due to the decision to early retire San Onofre Units 2 and 3, GAAP required reclassification of the amounts recorded in property, plant and equipment and related tangible operating assets to a regulatory asset to the extent that management concluded it was probable of recovery through future rates. Regulatory assets may also be recorded to the extent management concludes it is probable that direct and

indirect costs incurred to retire Units 2 and 3 as of each reporting date are recoverable through future rates. In accordance with these requirements and as a result of its decision to retire San Onofre Units 2 and 3, SCE reclassified $1,521 million of its total investment in San Onofre at May 31, 2013 to a regulatory asset ("San Onofre Regulatory Asset") and recorded an impairment charge of $575 million ($365 million after-tax) in the second quarter of 2013. As of December 31, 2013, SCE had recorded a net regulatory asset of approximately $1.3 billion, comprised of $1.56 billion of property, plant and equipment, less $266 million for estimated refunds of authorized revenue recorded in excess of SCE's costs of service.

As a result of the execution of the San Onofre OII Settlement Agreement by the Settling Parties, SCE has concluded that the outcome of the OII that is more likely than any other outcome is approval and implementation of the San Onofre OII Settlement Agreement, although approval by the CPUC remains uncertain. As a result, in the first quarter of 2014, SCE recorded an additional pre-tax charge of approximately $231 million (approximately $96 million after-tax). Including the amounts recorded during the first quarter of 2014 and the amounts previously recorded in 2013, the total impact of the San Onofre OII settlement is estimated at $806 million (approximately $461 million after-tax).

\* \* \*

*San Onofre OII Settlement Agreement Procedure*

On April 3, 2014, the Settling Parties filed a motion in the OII requesting the CPUC to approve the San Onofre OII Settlement Agreement without change, find the Settlement Agreement reasonable and expedite consideration of the San Onofre OII Settlement Agreement in order to provide the benefits of it as soon as possible. The Settling Parties also urged the CPUC to stay further proceedings in the OII pending a determination on the San Onofre OII Settlement Agreement and to withdraw the November 19, 2013 Proposed Decision on Phase 1 and Phase 1A issues in the OII. During the pendency of proceedings regarding the San Onofre OII Settlement Agreement, the Settling Parties are further bound to support and mutually defend the San Onofre OII Settlement Agreement in its entirety, oppose any modifications proposed by any non-settling party to the OII unless all Settling Parties agree, and cooperate reasonably on all submissions. The Settling Parties further agree to review any CPUC orders regarding the San Onofre OII Settlement Agreement to determine if the CPUC has changed or modified it, deleted a term or imposed a new term. If any Settling Party is unwilling to accept any such change, modification, deletion or addition of a new term, then the Settling Parties will negotiate in good faith to seek a resolution acceptable to all Settling Parties. If they are unable to resolve the matter to the satisfaction of all Settling Parties or to obtain prompt CPUC approval of an agreed upon resolution, then any Settling Party can terminate the Settlement Agreement upon prompt notice.

Under CPUC rules, parties in the OII have had an opportunity to comment on the San Onofre OII Settlement Agreement, and the CPUC held an evidentiary hearing on May 14, 2014 and a public

15

participation meeting on June 16, 2014, at which various intervenors who were not Settling Parties opposed the proposed settlement and others supported it. Following conclusion of the public participation meeting, approval of the San Onofre OII Settlement Agreement was submitted to an Administrative Law Judge to render a proposed decision for further consideration by the CPUC. CPUC rules do not provide for any fixed time period for the CPUC to act on the San Onofre OII Settlement Agreement. Pursuant to the CPUC's rules, no settlement becomes binding on the parties to it unless the CPUC approves the settlement based on a finding that it is reasonable in light of the whole record, consistent with law, and in the public interest. The CPUC has discretion to approve or disapprove a settlement, or to condition its approval on changes to the settlement, which the parties may accept or reject.

41.    On October 28, 2014, Edison filed with the SEC its Form 10-Q with the SEC the third quarter of 2014.  For the quarter, the Company reported net income of $508 million, or $1.46 per diluted share, on revenue of $4.36 billion, compared to a net income of $463 million, or $1.34 per diluted share, on revenue of $3.96 billion for the same period in the prior year.  The Form 10-Q contained signed certifications pursuant to SOX by defendant Craver stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.  In the Form 10-Q also disclosed in part:

***CPUC Proceedings and Proposed Settlement***

In October 2012, the CPUC issued an Order Instituting Investigation ("OII") that consolidated all San Onofre issues in related CPUC regulatory proceedings to consider appropriate cost recovery for all San Onofre costs, including among other costs, the cost of the steam generator replacement project, substitute market power costs, capital expenditures, and operation and maintenance costs.

On September 23, 2014, SCE entered into an Amended and Restated Settlement Agreement (the "San Onofre OII Amended Settlement Agreement") with The Utility Reform Network ("TURN"), the CPUC's Office of Ratepayer Advocates ("ORA"), SDG&E, the Coalition of California Utility Employees ("CUE"), and Friends of the Earth ("FOE") (together, the "Settling Parties"). If implemented, the San Onofre OII Amended Settlement Agreement will constitute a complete and final resolution of the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project ("SGRP") at San Onofre and the related outage and subsequent shutdown of San Onofre. The Settling Parties agreed to amend the Settlement Agreement that was originally entered into in March 2014 in response to an Assigned Commissioner's and Administrative Judges' Ruling that was issued on September 5, 2014. The San Onofre

16

OII Amended Settlement Agreement does not affect proceedings before the NRC or proceedings related to recoveries from third parties described below, but does describe how shareholders and customers will share any potential recoveries. Implementation of the San Onofre OII Amended Settlement Agreement is subject to the approval of the CPUC. The San Onofre OII Amended Settlement Agreement is subject to termination by any of the Settling Parties if the CPUC has not approved it by December 23, 2014. On October 9, 2014, the Administrative Law Judges in the OII issued a Proposed Decision approving the San Onofre OII Amended Settlement Agreement. Under applicable rules, the CPUC cannot render a final decision for at least thirty days following the date of the Proposed Decision, but there can be no certainty of when or what the CPUC will actually decide. The parties to the San Onofre OII Amended Settlement Agreement have agreed to exercise their best efforts to obtain CPUC approval.

* * *

*San Onofre OII Settlement Agreement Procedure*

On October 9, 2014, the Administrative Law Judges in the San Onofre OII issued a Proposed Decision approving the San Onofre OII Amended Settlement Agreement. Under its rules, the CPUC may not render a final decision for at least thirty days following the issuance of the Proposed Decision, but the rules do not otherwise provide for any fixed time period for the CPUC to act on the San Onofre OII Amended Settlement Agreement. Pursuant to the CPUC's rules, no settlement becomes binding on the parties to it unless the CPUC approves the settlement based on a finding that it is reasonable in light of the whole record, consistent with law, and in the public interest. The CPUC has discretion to approve or disapprove a settlement, or to condition its approval on changes to the settlement, which the parties may accept or reject.

Accordingly, there can be no assurance regarding the timing of any CPUC decision or that the CPUC will approve the San Onofre OII Amended Settlement Agreement or refrain from making changes to it that are not acceptable to all the Settling Parties. Thus, there can be no assurance that the OII proceeding will provide for recoveries as currently estimated by SCE in accordance with the San Onofre OII Amended Settlement Agreement, including the recovery of costs recorded as a regulatory asset, or that the CPUC does not order refunds to customers above those contemplated by the San Onofre OII Amended Settlement Agreement. Therefore, the amount recorded for the San Onofre Regulatory Asset is subject to further change based upon future developments and the application of SCE's judgment to those events.

42.     On November 20, 2014, the final settlement was approved by the CPUC.

43.     At some time in January 2015, investigators executed a search warrant on the home of former CPUC President Peevey's home in La Cañada Flintridge,

1  California.  The search warrant uncovered, among other things, handwritten notes

2  related to an *ex parte* meeting with Company personnel in Warsaw, Poland,

3  discussed directly below.

4      44.    On February 9, 2015, months after approval of the negotiated

5  settlement, and a week after the Company finally implemented a policy covering

6  *ex parte* communications with CPUC decisionmakers, Edison late-filed notice of

7  an *ex parte* communication that occurred on or about *March 26, 2013*, between a

8  Southern California Edison Vice President, Stephen Pickett ("Pickett") and then-

9  President of the CPUC, Michael Peevey ("Peevey") at a hotel in Warsaw, Poland.

10  SONGS and the OII were discussed in this undisclosed meeting, which took place

11  during an event that the Company underwrote including funding for the trip.  The

12  notice filed by the Company however, states "Mr. Pickett does not recall exactly

13  what he communicated to Mr. Peevey, it now appears that he may have crossed

14  into a substantive communication."   The late-filed notice only summarizes the

15  improper undisclosed communication but provides no original documentation.

16      45.    The same day, in another indication that defendants were aware of the

17  serious compliance deficiencies demonstrated by this belated disclosure, and had

18  been for some time, they caused Edison to issue a press release announcing

19  "Strengthened Policies Governing Contacts With the Commission," which states in

20  part:

> The system of policies and procedures revised by SCE starting *last year* include intensified and ongoing training regarding the CPUC's *ex parte* rules and the adoption of internal procedures that exceed current CPUC requirements.[6]  Under its strengthened policies, SCE requires advance approval from its legal department if an employee plans to engage with a CPUC decision-making about a pending proceeding.  The policy also imposes limitations on interactions with decision-makers.

[6]    The conflict between this reference to "last year" and the new policy dated February 2015 was not explained.

(Emphasis added.)

46.    The next day, the Alliance For Nuclear Responsibility filed in the SONGS proceeding a motion for sanctions, noting that this late disclosure violated the CPUC Rules governing *ex parte* communications and ethics.  According to the motion for sanctions:

> Unit 2 restart efforts were a core subject of Phase 1 of the Commission's investigation, and SCE now admits discussing "a framework for a possible resolution of the [entire] Order Instituting Investigation" with the Commission President nearly seven weeks before the Phase 1 evidentiary hearings even commenced.

47.    Further, the sanctions brief calls attention to additional *ex parte* communications covered by CPUC rule 8.4 between defendant Craver and Peevey, admitted to by defendant Craver in an analyst conference call in June 2013, but never noticed in the SONGS OII.  During that conference call, defendant Craver stated:

> Steve, this is Ted Craver I want to just add a little bit in here. The last couple of days, I've been able on the phone with the Governor,[7] as well as President Peevey.

The timing of this communication is relevant in that formal settlement negotiations did not begin until mid or late June 2013.  The Alliance 4 Nuclear Responsibility brief concludes: "The unavoidable inferences… suggest that [Southern California Edison] has considerably more disclosures to make before the scope of its violations of Rule 8.4… can be determined."

48.    On February 24, 2015, Edison filed with the SEC its Form 10-K for the fourth quarter and fiscal year 2014.  For the fourth quarter, net income was $448 million, or $1.27 per diluted share, on revenue of $3.11 billion, compared to

---

[7]    Communications with the governor do not appear to fall under the CPUC Rules on ex parte communications.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

net income of $326 million, or $0.92 per diluted share, on revenue of $2.94 billion for the same period in the prior year.   For the full year, net income was $1.72 billion, or $4.89 per diluted share, on revenue of $13.41 billion, compared to net income of $1.02 billion, or $2.78 per diluted share, on revenue of $12.58 billion for 2013.   The Form 10-K contained a signed certifications pursuant to SOX by defendant Craver stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.   The Form 10-K carries the signatures of defendants Bindra, Chang, Craver, Schlosberg, Stuntz, Sutton, Tauscher, and White, and discloses in part:

> In October 2012, the CPUC issued an OII that consolidated all San Onofre issues in related CPUC regulatory proceedings to consider appropriate cost recovery for all San Onofre costs, including among other costs, the cost of the steam generator replacement project, substitute market power costs, capital expenditures, and operation and maintenance costs.

> On November 20, 2014, the CPUC approved the Amended and Restated Settlement Agreement (the "San Onofre OII Settlement Agreement") that SCE had entered into with TURN, the ORA, SDG&E, the Coalition of California Utility Employees, and Friends of the Earth (together, the "Settling Parties"). The San Onofre OII Settlement Agreement resolved the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project at San Onofre and the related outage and subsequent shutdown of San Onofre. The San Onofre OII Settlement Agreement does not affect proceedings related to recoveries from third parties described below, but does describe how shareholders and customers will share any potential recoveries. SCE has recorded the effects of the San Onofre OII Settlement Agreement. Such amounts do not reflect any recoveries from third parties by SCE.

> A lawsuit challenging the CPUC's authority to permit rate recovery of San Onofre costs and an application for rehearing of the CPUC's decision approving the San Onofre OII Settlement Agreement were filed in November and December 2014, respectively. On February 9, 2015, SCE filed in the OII proceeding a Late-Filed Notice of *Ex parte* Communication regarding a meeting in March 2013 between an SCE senior executive and the president of the CPUC, both of whom have since retired from their respective positions. In response, the Alliance for Nuclear Responsibility, one of the intervenors in the OII, filed an application requesting that the CPUC institute an investigation into whether sanctions should be imposed on SCE in connection with the *ex parte* communication. The application requests that the CPUC order SCE to produce all *ex parte* communications

between SCE and the CPUC or its staff since January 31, 2012 and all internal SCE unprivileged communications that discuss such *ex parte* communications.

49.    On March 13, 2015, the Company filed with the SEC its definitive proxy statement in advance of the 2015 annual meeting of shareholders.  The proxy statement solicited shareholder votes for the election of defendants Bindra, Chang, Craver, Schlosberg, Stuntz, Tauscher, Taylor, and White, as well as a new nominee, William P. Sullivan to the Edison and Southern California Edison Boards.  The proxy statement includes a description of the Company's "scoring matrix" for executive incentive compensation at both Edison and Southern California Edison, both of which matrices list "Obtained CPUC approval for fair settlement resolving outstanding issues related to the early retirement of the San Onofre Nuclear Generating Station," as "Key Factors Contributing to Actual Score."  In the case of both Edison and Southern California Edison, the financial performance score, based in part on the resolution of the SONGS OII, were the highest possible.  In support of this solicitation, the proxy statement discloses:

> Our Corporate Governance Guidelines provide that one of the Board's primary functions is to review the Company's enterprise risk management process and monitor strategic and emerging risks. The Board annually reviews key enterprise risks identified by management, such as financial, reputational, safety, physical and cyber security, and compliance risks, and monitors key risks through reports and discussions regarding key risk areas at Board meetings. The Board also focuses on specific strategic and emerging risks in periodic strategy reviews. The Board annually reviews corporate goals and approves capital budgets.

> Board committees have responsibility for risk oversight in specific areas as follows:

> The Audit Committee is responsible for oversight of (i) risk assessment and risk management policies, (ii) major financial risk exposures, and (iii) the steps management has taken to monitor and control these exposures. In carrying out these responsibilities, the Committee semi-annually reviews the Company's risk management

processes and key enterprise risks, reviews the EIX risk management committee charter, receives regular reports on litigation, internal audits and compliance, receives "deep dive" reports on specific risk topics at meetings, and receives semi-annual reports of the Company's political contributions. The Committee also annually reviews and approves the internal audit plan. The EIX Vice President for Risk Management regularly attends Committee meetings and reports on risk issues.

50.     The proxy statement was misleading as filed because it concealed information that a reasonable investor would have found material in deciding how to vote for the Company's director nominees.  Specifically, although the proxy used the supposedly "fair and reasonable" SONGS settlement to justify the highest possible incentive award payments under the Company's incentive payment regime, the SONGS settlement had actually been procured through the fraudulent concealment of a systematic plan of *ex parte* contacts designed to influence the outcome of the proceeding before the CPUC.  Worse still, these *ex parte* contacts had not been disclosed as required by law, leaving the settlement on tenuous ground and the putting the Company at risk of incurring substantially higher legal bills and liabilities in connection therewith.

51.     On April 10, 2015, the California Attorney General provided the CPUC with the Warsaw notes seized from former CPUC President Peevey's home in January 2015.

52.     Also on April 10, 2015, the Company issued a press release titled "Southern California Edison Statement on San Onofre Nuclear Plant Settlement," which states in part:

> ROSEMEAD, Calif., April 10, 2015 — Notes filed today in federal court relate to a notice Southern California Edison filed in February with the California Public Utilities Commission (CPUC) regarding a conversation with a CPUC commissioner in 2013. The notes underscore numerous differences between the conversation in 2013 and the final settlement of the San Onofre nuclear plant investigation.

1
2
3
4
5
6

The notes were drafted by then SCE executive Stephen Pickett, with annotations by CPUC President Michael Peevey, who requested the meeting to get an update on efforts to restart San Onofre. As SCE explained in the CPUC notice, on March 26, 2013, Mr. Peevey initiated a communication in which he expressed his thoughts on the structure of a possible resolution of the Order Instituting Investigation (OII) for the San Onofre nuclear plant. Mr. Peevey indicated he would consider such a resolution acceptable but would nonetheless require agreement among at least some of the parties to the Investigation.

7   53.   Then, on April 13, 2015, Edison late-filed yet another notice of *ex*

8  *parte* communication relating to the Warsaw, Poland meeting.  The filing includes

9  copies of notes from the Warsaw meeting in 2013, apparently written by Pickett

10  and annotated by Peevey, which clearly demonstrate that the *ex parte* conversation

11  was substantive and related to the SONGS OII, including a sketch of potential

12  settlement amounts and a step-by-step strategy for resolving the proceeding on

13  terms favorable to Edison.

14   54.   The next day, on April 14, 2015, the CPUC Administrative Law Judge

15  issued a ruling directing the Company to provide additional information related to

16  the late-filed notices of *ex parte* communications.  The ruling directs SCE to

17  provide additional information to the commission and the parties no later than

18  April 29, 2015 as follows: (a) documents regarding communications about

19  potential settlement of the SONGS OII between any Southern California Edison

20  employee and CPUC Decisionmakers between March 1, 2013 and November 31,

21  2014; (b) internal Company documents reporting, discussing, or referring to

22  category (a); and (c) promptly file notices of any undisclosed *ex parte*

23  communication.

24   55.   On April 17, the Office of Ratepayer Advocates issued a press release

25  titled, "ORA Director Joe Como Response to Conduct by Southern California

26  Edison and Former CPUC President Michael Peevey  to Undermine the SONGS

27  Settlement Process," which states in part:

28

SAN FRANCISCO, April 17, 2015 – The Office of Ratepayer Advocates (ORA), the independent consumer advocate within the California Public Utilities Commission (CPUC) wants *at least $648 million* returned to customers of Southern California Edison Company (Edison) and San Diego Gas & Electric Company (SDG&E) because of recently revealed evidence of inappropriate conversations between former CPUC President Michael Peevey and Edison Executive Vice President Stephen Pickett. These two individuals worked in secret to outline an acceptable financial settlement of the San Onofre Nuclear Generating Station (SONGS) closure. This back-channel deal between a regulator and the utility may have undermined the efforts of ORA and The Utility Reform Network (TURN) to negotiate the best deal for ratepayers.

ORA is outraged at the revelations regarding CPUC rule violations that occurred prior to the commencement of the SONGS settlement negotiations, and that Edison's actions have undermined the results of ORA's good faith negotiations to represent the best interests of ratepayers. ORA looks forward to actively participating in any investigation to uncover further wrongdoing.

On February 9, 2015, ORA first became aware of the discussion between Peevey and Pickett when Edison filed with the CPUC a 2-year late *ex parte* notice of the meeting that occurred in March 2013 in Warsaw, Poland. On Friday April 10, 2015, we learned that the conversation outlined a framework for a SONGS settlement and was memorialized on hotel stationery (commonly referred to as the Hotel Bristol Notes). ORA had not seen the Hotel Bristol Notes until they were publically released one week ago by the California Attorney General.

* * *

The process for fair dealings at the CPUC had been severely compromised. But to simply invalidate the settlement and go back to the hearing room would essentially give Edison the opportunity to litigate for an outcome that may be worse than the settlement. Edison should not be given a second bite at the apple. But if the CPUC were to scrap the SONGS settlement, ORA is prepared to vigorously litigate for a better outcome.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

> Alternately ORA recommends, at a minimum, Edison be sanctioned
> and required to return to ratepayers an additional $648 million, which
> represents the difference between ORA's original litigation position
> and what the settlement provided. Furthermore, as more information
> is developed in the investigation that determines the extent to which
> Edison worked to mislead the CPUC by artifice or false statements,
> Edison should be further sanctioned.

(Emphasis added.)

56.   On April 27, 2015, the Company disclosed that all of the Individual Defendants were reelected to new terms on the Boards of Edison and Southern California Edison.  The reelection of defendants based on the misleading proxy statements was a fundamental link in their continued breaches of fiduciary duties because they could not have continued their deception as alleged below without reelection to Edison's Board.

57.   Also on April 27, 2015, the Alliance For Nuclear Responsibility filed a petition for modification with the CPUC seeking modification to the decision approving the November 2014 settlement of the SONGS proceeding.  The petition states in part that the Company committed "extrinsic fraud" and that the record manifests a collusive effort by the Company "outside the [SONGS] proceeding to scuttle the Commission's investigation nearly seven weeks before evidentiary hearings even commenced."  The brief states that had the Alliance For Nuclear Responsibility been aware of the *ex parte* communications in Poland, it would have contested numerous elements of the design and execution of the SONGS investigation argues that:

> SCE's exclusive knowledge of the oral and written communications in
> the collateral Peevey-Pickett meeting unfairly deprived A4NR and
> other parties of the bility to fully participate in [the SONGS
> proceeding].

* * *

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Speaking only for itself, had A4NR received timely notice of Mr. Pickett's March 26, 2013 oral and written *ex parte* communications to Mr. Peevey, including a copy of the Notes, it would have:

* * *

- attended the March 27, 2014 "settlement conference" required by Rule 12.1(b) and pointed out that, in negotiating with the Office of Ratepayer Advocates ("ORA") and The Utility Reform Network ("TURN"), SCE had managed to improve its position by $1.419 – 1.438 billion from the position attributed to Mr. Peevey in the Notes;

- documented in its May 7, 2014 Opening Comments Opposing the Proposed Joint Settlement Agreement (and reiterated in its May 22, 2014 Reply Comments) that, in negotiating with ORA and TURN, SCE had managed to improve its position by $1.419 – 1.438 billion from the position attributed to Mr. Peevey in the Notes;

- cross-examined the witnesses from SCE, ORA, and TURN at the May 14, 2014 evidentiary hearing on how their claim that the Proposed Joint Settlement Agreement reflected "a hard-fought process over many months"could be reconciled with a result $1.419 – 1.438 billion inferior to that articulated by Mr. Peevey in the Notes;

- identified in its September 15, 2014 Comments on the Assigned Commissioner and Administrative Law Judges' Ruling Requesting Settling Parties to Adopt Modifications to Proposed Settlement Agreement that, despite the improvements represented by the requested modifications, the result remained $1.239 – 1.309 billion inferior to the position articulated by Mr. Peevey in the Notes[;]

- argued in its October 29, 2014 Opening Comments on the Proposed Decision approving the Amended and Restated Settlement Agreement (and reiterated in its November 3, 2014 Reply Comments) as well as in its October 31, 2014 oral argument to the full Commission that – notwithstanding the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

> "hard-fought process" and the requested modifications to correct "provisions which unfairly disfavor ratepayers" – the Commission was being asked to approve an outcome $1.239 – 1.309 billion worse for ratepayers than the position articulated by Mr. Peevey in the Notes.
>
> * * *
>
> SCE's failure to provide timely proper disclosure of the oral and written *ex parte* communications with Mr. Peevey constituted fraud-by-concealment against the parties that SCE induced to enter into the SONGS settlement.

58.   Attached to the petition as an exhibit is a declaration by the Alliance For Nuclear Responsibility's counsel, which states in part:

> My April 13, 2015, conclusion was that SCE (and by its SONGS co-ownership, SDG&E) managed to improve its position by at least $919 million, and arguably $1.522 billion, from the position attributed to Mr. Peevey in the Notes. I have subsequently reviewed an ORA press release dated April 17, 2015, included as Attachment 3 to this Declaration, and a TURN press release dated April 17, 2015. Both press releases electronically link to the same comparison document, which I have carefully examined and include as Attachment 2 to this Declaration. Based on the information in the ORA/TURN document and my further reflection, I have revised my estimate of SCE's improved bargaining position in negotiating the March 27, 2014 settlement proposal to a range of $1.419 billion and $1.438 billion.

59.   On April 28, 2015, Edison filed with the SEC its Form 10-Q for the first quarter of 2015.  In the quarter, the Company reported net income of $327 million, or $0.91 per diluted share, on revenue of $2.51 billion, compared to a net income of $202 million, or $0.54 per diluted share, on revenue of $2.93 billion for the same period in the prior year.  The Form 10-Q contains a signed certification pursuant to SOX by defendant Craver stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.   The Form 10-Q also discloses:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

**San Onofre Proceedings, Recoveries, and Decommissioning**

As discussed in the 2014 Form 10-K, in November 2014, the CPUC approved the San Onofre OII Settlement Agreement that SCE had entered into with TURN, the ORA, SDG&E, the Coalition of California Utility Employees, and Friends of the Earth. The San Onofre OII Settlement Agreement resolved the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project at San Onofre and the related outage and subsequent shutdown of San Onofre. The San Onofre OII Settlement Agreement does not affect proceedings related to recoveries from third parties described below, but does describe how shareholders and customers will share any potential recoveries.

A federal lawsuit challenging the CPUC's authority to permit rate recovery of San Onofre costs and an application to the CPUC for rehearing of its decision approving the San Onofre OII Settlement Agreement were filed in November and December 2014, respectively. On April 16, 2015, a ruling was issued dismissing the federal lawsuit with prejudice.

In February 2015, SCE filed in the OII proceeding a Late-Filed Notice of *Ex parte* Communication regarding a meeting in March 2013 between an SCE senior executive and the president of the CPUC, both of whom have since retired from their respective positions. In response, the Alliance for Nuclear Responsibility, one of the intervenors in the OII, filed an application requesting that the CPUC institute an investigation into whether sanctions should be imposed on SCE in connection with the *ex parte* communication. The application requests that the CPUC order SCE to produce all *ex parte* communications between SCE and the CPUC or its staff since January 31, 2012 and all internal SCE unprivileged communications that discuss such *ex parte* communications.

On April 14, 2015, the OII ALJs ordered SCE to produce unprivileged documents pertaining to oral and written communications regarding the possible settlement of the OII proceeding between any SCE employee and CPUC decision makers. SCE's response is due on April 29, 2015.

On April 17, 2015, ORA and TURN issued press releases asking the CPUC to impose penalties on SCE in connection with the *ex parte* communication. ORA recommended penalties in the amount of $648 million, representing ORA's calculation of the difference in ratepayer value between ORA's initial negotiating position in the SONGS OII and the approved settlement. TURN did not recommend a penalty amount. Neither party asked the CPUC to reopen the settlement. TURN stated that, based on SCE's response to the OII ALJs' April 14, 2015 order, it may seek a reopening of the OII proceeding. On April 27, 2015, the Alliance for Nuclear Responsibility filed a petition to modify the CPUC's decision approving the San Onofre OII Settlement Agreement due to the *ex parte* communication. The petition seeks the reversal of the decision approving the San Onofre OII Settlement Agreement and reinstatement of the OII proceeding.

1    SCE cannot predict the outcome of these proceedings.

2    60.    On April 29, 2015, as directed by the CPUC's April 14, 2015

3    decision, the Company produced hundreds of pages of previously undisclosed *ex*

4    *parte* communications.    This precipitated a flood of motions in the SONGS

5    proceeding by various parties against Edison, including a motion from the Office

6    of Ratepayer Advocates seeking an interim ban on communications between

7    Southern California Edison and the CPUC

8    61.    On June 24, 2015, The Utility Reform Network filed a response to the

9    Alliance For Nuclear Responsibity's petition for modification of the settlement.  In

10    the brief, The Utility Reform Network writes:

11
12    *TURN... believes that the Commission should reopen the SONGS*
      *investigation to address the public perception that the outcome was a*
13    *product of intervention by former President Michael Peevey and*
      *decide the allocation of costs related to the shutdown facility through*
14    *litigation rather than via settlement.*

15                                          * * *

16

17    A4NR asserts that the failure of SCE to disclose its extensive
      communications with former President Peevey represents fraud by
18    concealment that unfairly disadvantaged TURN and the Office of
      Ratepayer Advocates in the settlement negotiations. A4NR argues
19    that, had SCE filed *ex parte* notices disclosing these communications,
      "both ORA and TURN would likely have negotiated a better
20    settlement".3 As a remedy, A4NR proposes that the Commission set
      aside approval of the amended settlement agreement, revive the Phase
21    1 Proposed Decision, and prepare a Proposed Decision in Phase 2
      based on the previously submitted briefs. A4NR further proposes that
22    parties be directed to submit written recommendations for "how best
      to conclude I.12-10-013".
23

24

25    TURN    agrees    that    recent    disclosures    detailing    extensive
      communications between SCE and CPUC decisionmakers during the
26    pendency of this proceeding are very troubling. TURN was a good
      faith participant in the settlement negotiations, and was not aware of
27    the Warsaw note, the private meeting, or any agreement between Mr.
28
                                          29

Peevey and SCE at any time before or during the extended settlement negotiations that led to the proposed settlement. Had SCE disclosed these communications in a timely manner, this information would have had an impact on settlement negotiations although it is not clear whether the outcome for ratepayers would have been materially different.

\* \* \*

…TURN is concerned that recent revelations of extensive private conversations and dealmaking between SCE and Mr. Peevey create the public perception that the settlement process was fundamentally and irreparably tainted and drove outcomes that are unfair to ratepayers. Moreover, ongoing federal and state investigations that caused the disclosure of the Warsaw note may lead to criminal indictments. In light of these extraordinary circumstances, the Commission must take steps to restore public confidence in the legitimacy of its process relating to SONGS. The most direct way to restore public confidence on these matters is to reopen the proceeding and determine the allocation of SONGS-related costs without any possible involvement by Mr. Peevey and based exclusively on testimony, evidentiary hearings and briefs.

(Emphasis added.)

62.     On June 26, 2015, the CPUC Administrative Law Judge issued an email ruling requesting supplemental information from SCE by July 3, 2015.  The ruling directs the Company to produce additional information regarding numerous previously undisclosed *ex parte* communications between January 2013 and March 2014.

63.     On July 3, 2015, Edison produced still more information previously un-disclosed *ex parte* communications, when, in response to the foregoing ruling, it filed with the CPUC an additional *43* documents.

64.     During the week of July 6, 2015, numerous media reports stated that the California Attorney General's office had issued and executed two search warrants, at least one of which involved a search of Edison headquarters, regarding arrangements made between former CPUC President Peevey and Edison.

# DAMAGES TO THE COMPANY

65.    Edison has been, and will continue to be, severely damaged and injured by defendants' misconduct.   As a direct and proximate result of the defendants' conduct, Edison has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

(a)    enormous legal costs incurred due to the late-filed *ex parte* notices and, regardless of outcome of the outcome at the SONGS OII level, now-assured years of appeals and litigation arising out of same;

(b)    potential criminal and/or civil liability arising out of the California Attorney General's investigation;

(c)    potentially hundreds of millions of dollars of increased liability under the SONGS OII;

(d)    costs related to complying with search warrants and CPUC orders to produce hundreds of documents, many of which are years old;

(e)    costs already incurred and to be incurred defending against the pending securities class actions;

(f)    costs already incurred defending government investigations, subpoenas, and suits;

(g)    any fines that are a result of the Company's violations federal and state law; and

(h)    incentive compensation paid to executives based on the fraudulently procured SONGS settlement.

66.    In addition, Edison's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company has still not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

67.    The actions complained of herein have irreparably damaged Edison's corporate image and goodwill.  For at least the foreseeable future, Edison will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Edison's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

68.    Plaintiff brings this action derivatively in the right and for the benefit of Edison to redress injuries suffered, and to be suffered, by Edison as a direct result of breaches of fiduciary duty, waste of corporate assets, and violations of violations of §14(a) of the Securities Exchange Act by the Director Defendants. Edison is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

69.    Plaintiff will adequately and fairly represent the interests of Edison in enforcing and prosecuting its rights.

70.    Plaintiff has continuously been a shareholder of Edison at times relevant to the wrongdoing complained of and is a current Edison shareholder.

71.    Edison's current Board of Directors consists of the following eight Individual Defendants: Craver, Bindra, Chang, Schlosberg, Stuntz, Tauscher, Taylor, and White, as well as non-defendant director Sullivan.  Plaintiff has not made any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the reasons set forth below.

**Pre-Suit Demand Is Excused Because A Majority Of The Current Board Members Face A Substantial Risk Of Liability For Their Own Misconduct**

**Defendant Craver**

72.    Defendant Craver has served as Chairman of Edison's Board, President, and CEO since 2008.  Defendant Craver is also a member of the

1  Southern California Edison Board.  Defendant Craver has thus presided over all

2  wrongdoing alleged herein both as CEO and as the head of the Board.

3       73.    Defendant Craver undeniably was aware of the improper and

4  concealed *ex parte* communications because he was personally involved in a

5  number of them.  Specifically, according to documents produced in the CPUC

6  proceeding, defendant Craver engaged in improper *ex parte* communications that

7  were fraudulently concealed in April, June, and November of 2013 and at least

8  May and June of 2014.  As a result: (a) defendant Craver knew that improper *ex*

9  *parte* communications seeking to influence the outcome of the SONGS proceeding

10  occurred; (b) he knew the *ex parte* communications were required to be timely

11  disclosed; and (c) because the *ex parte* communications were not timely disclosed,

12  defendant Craver obviously decided not to ensure his improper *ex parte*

13  communications were disclosed.

14       74.    Moreover, defendant Craver knew *ex parte* communications were

15  occurring because he engaged in them but he declined to require the Company he

16  was charged with running to implement *any policy at all* requiring oversight or

17  supervision of *ex parte* communications themselves.  Likewise, defendant Craver,

18  knowing *ex parte* communications were occurring and knowing they implicated

19  legal responsibilities on the part of Edison, nevertheless declined to require the

20  Company to institute controls or a policy for complying with these legal

21  obligations.

22       75.    Defendant Craver knew that Edison had fraudulently concealed the

23  improper influence it exercised over CPUC decisionmakers and that when Edison

24  obtained a settlement of the SONGS proceeding it considered favorable, that

25  outcome had been obtained via this fraud.  However, defendant Craver permitted

26  the Company to enter the settlement obtained through fraud and declined to require

27  the wrongdoing to be disclosed.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

76.   As a result of the foregoing, defendant Craver knew that disclosures in public filings that he signed both describing the SONGS OII and Edison's internal controls were inaccurate and misleading because they omitted information that a reasonable investor would have considered material: that the Company's internal controls over legal compliance were deficient and as a result, a settlement involving billions of dollars of negotiated distribution of liabilities was predicated on wrongdoing and was therefore susceptible to enormous future legal costs and potential liability to Edison.

77.   As a result of the foregoing, demand is excused as to defendant Craver because he faces a substantial likelihood of liability in due to his complicity in the wrongdoing alleged and his breaches of fiduciary in connection therewith.

78.   Further, Defendant Carver is primarily employed as the President and CEO of Edison.  In his role at Edison, defendant Carver earns nearly $15 million per year.  His professional reputation and access to continued compensation from Edison are completely reliant on the goodwill of his fellow directors who have the ability to replace him as CEO.  As a result, he is unable to disinterestedly and independently consider a demand for action against his fellow directors.  Demand as to defendant Carver is excused for this reason as well.

**Defendants Bindra, Schlosberg, Taylor, and White**

79.   Defendants Bindra, Schlosberg, Taylor, and White knew of improper *ex parte* communications and permitted their concealment, did not implement internal controls for the oversight of *ex parte* communications, and did not to implement internal controls designed to ensure the Company complied with its legal obligations with respect to the SONGS proceeding and *ex parte* rules generally.   In particular, defendants Bindra, Schlosberg, Taylor, and White received an email from defendant Craver in June 2013, while negotiations over SONGS were ongoing, describing two improper, substantive, *ex parte* contacts with former-CPUC President Peevey.   The email specifically describes two

1   conversations with Peevey referencing the SONGS OII and coordinating public
2   statements and lobbying efforts in an effort to encourage California Governor
3   Brown to "say something positive about [Edison's] handling of the situation." The
4   email does not explain why Craver was speaking to Peevey about SONGS and uses
5   a tone of familiarity, both of which suggest that this was not the first time that
6   Craver apprised these directors of *ex parte* communications with Peevey and
7   Edison's illegal efforts to influence the SONGS investigation.

8       80.   As a result, defendants Bindra, Schlosberg, Taylor, and White knew
9   *ex parte* communications were occurring and that these communications were
10  designed to influence the SONGS proceeding.    However, defendants Bindra,
11  Schlosberg, Taylor, and White declined to ensure the Company disclosed these
12  communications as they were required to do. As alleged below, defendants Bindra
13  Schlosberg, Taylor, and White were aware of the rules regarding *ex parte*
14  communications at all relevant times. Moreover, when, in February 2015, the
15  Company disclosed the previously concealed Warsaw meeting, these directors
16  were again reminded that the Company was required to disclose *ex parte*
17  communications.   However, they declined require the Company to disclose the
18  June 2013 email from Craver which they had received.    Indeed, this
19  communication was not disclosed until the end of April 2015, and only then
20  because a CPUC decision specifically *required* Edison to produce it because, even
21  though Edison had been required to disclose it all along, it had not.

22      81.   As a result, demand is excused as to defendants Bindra, Schlosberg,
23  Taylor, and White.  They knew of improper *ex parte* communications.  They knew
24  the Company was fraudulently attempting to influence the SONGS proceeding and
25  that the ultimate terms of the settlement were obtained due to fraud.   However,
26  they declined to require the Company to disclose the *ex parte* communications of
27  which they knew, let alone all improper *ex parte* communications of which they
28  may or may not have had specific knowledge.  They also declined to require the

Company to adopt policies and controls that would ensure it complied with relevant legal requirements.   Instead, they signed multiple Forms 10-K misleadingly and inaccurately failing to disclose this fraud and misleadingly and inaccurately describing the Company's internal controls.   Moreover, when the issue re-emerged in February 2015, they still did not require the Company to come clean and they did not even require the Company to disclose the concealed *ex parte* communications they personally knew of.   Therefore, defendants Bindra, Schlosberg, Taylor, and White face a substantial likelihood of liability and could not consider a demand for action in a disinterested and independent manner.

**The Audit Committee Defendants**

82.   Defendants Bindra, Tauscher, and Taylor are members of the Audit Committee, and defendant Chang is the Chair of the Audit Committee.   According to the Company's proxy statements, the Audit Committee met six times in each of 2013 and 2014.   The Company's most recently filed proxy statement:

> The Audit Committee is responsible for oversight of (i) risk assessment and risk management policies, (ii) major financial risk exposures, and (iii) the steps management has taken to monitor and control these exposures. In carrying out these responsibilities, the Committee semi-annually reviews the Company's risk management processes and key enterprise risks, reviews the EIX risk management committee charter, receives regular reports on litigation, internal audits and compliance, receives "deep dive" reports on specific risk topics at meetings, and receives semi-annual reports of the Company's political contributions.

83.   The Audit Committee, according to its charter adopted February 2013, is tasked with oversight of: (a) the integrity of the Company's financial statements; (b) "the Company's systems of disclosure and internal control regarding finance, accounting, legal compliance and ethics that management and the Board of established;" (d) "the Company's compliance with legal and regulatory requirements;" and (e) "the performance of the Company's Chief Ethics and

Compliance Officer… and of the Company's Ethics and Compliance function."
The charter also states that defendants Bindra, Chang, Tauscher, and Taylor, as
Audit Committee members "have the authority (without having to seek Board
approval) and appropriate funding… to obtain advice and assistance from…
outside legal, accounting and other advisors, and to incur ordinary administrative
expenses as it deems necessary or appropriate to carry out its duties." The charter
also vests the Audit Committee with the authority to request the Company's
independent auditor, the Chief Ethics and Compliance Officer, management, or
"any other internal or external advisors" to conduct "any" investigations, reviews,
or studies of any matter within the scope of the Committee's duties and
responsibilities, and "[i]n connection with any such investigation, the Committee
shall have unrestricted access to Company personnel and documents."

84.    Additionally, pursuant to the Audit Committee charter, defendants
Bindra, Chang, Tauscher, and Taylor are *required* ("the Committee shall") to
review the Company's internal controls over financial reporting "including systems
of disclosure." The Audit Committee is *required* ("shall review and discuss") to
review the effect of regulatory initiatives on the Company's financial statements.
The charter provides the Audit Committee "shall" annually review the
performance of the Chief Ethics and Compliance Officer and "shall" receive a
written report from that officer regarding the status of the Ethics and Compliance
program, "including information about Ethics and Compliance Helpline calls and
investigation trends. Moreover, defendant Chang, as Chair, "shall be notified
promptly, and in no event subsequent to the final disposition of the matter, by the
[Chief Ethics and Compliance Officer] of any 'significant' matters." The Audit
Committee charter states the Committee "shall" conduct executive sessions with
the Chief Compliance and Ethics Officer "as necessary to provide an opportunity
to address any issues related to the ethics and compliance program that the
Committee or the [Chief Ethics and Compliance Officer] believe are more

1    appropriately addressed without management present."  The Committee likewise

2    "shall" meet with the Chief Ethics and Compliance Officers in executive session at

3    least annually to discuss… management's support of and adherence to the ethics

4    and compliance program."   Finally, the Audit Committee "periodically shall

5    review information provided by management and the Company's legal counsel on

6    litigation and regulatory proceedings."

7          85.   As a result, defendants Bindra, Chang, Tauscher, and Taylor were

8    required to conduct inquiry and supervision into such issues as the SONGS

9    regulatory proceeding and the Company's *ex parte* contacts with CPUC

10   decisionmakers.  The Audit Committee charter makes clear this function is not

11   optional and the Committee was unambiguously required, at all relevant times, to

12   conduct oversight.  However, the Audit Committee did not cause the Company to

13   disclose its *ex parte* contacts as it was required to, did not prevent the Company

14   from entering a settlement agreement the terms of which were procured through

15   fraud, and did not implement controls to ensure the Company complied with its

16   legal and ethical responsibilities.

17         86.   Under the Audit Committee charter, defendants Bindra, Chang,

18   Tauscher, and Taylor were required to discuss regulatory initiatives, such as the

19   SONGS investigation and proceeding, and settlement thereof.  They were required

20   to review written reports regarding the Company's Compliance and Ethics

21   function.  They were required to discuss significant matters, such as the SONGS

22   proceeding and settlement, which were extremely significant to Edison's financial

23   health, with the Chief Compliance and Ethics Officers.  Either defendants Bindra,

24   Chang, Tauscher, and Taylor did these actions as they were required to and

25   therefore knew of the Company's systematic and prolonged *ex parte* efforts to

26   influence the outcome of SONGS proceeding, or they breached their fiduciary

27   duties as Audit Committee members by failing to act as they were unambiguously

28   required to under the charter.  Either these four defendants discharged their duties

and therefore knew that the Company did not have a policy covering *ex parte* communications and legal compliance related thereto but nonetheless declined to institute a policy until it was too late, or these four defendants did not act as they were required to and thereby breached their fiduciary duties.

87.     Although Edison is a large company, the SONGS proceeding and settlement were unequivocally material to its business.  In light of that fact, if defendants Bindra, Chang, Tauscher, and Taylor were discharging their duties under the Audit Committee charter they were required to conduct oversight related to that proceeding.  If they conducted oversight as required by the charter, they knew that the disclosure of *ex parte* communications was a legal reporting requirement imposed on Edison and that if the Company did not abide by this legal reporting requirement it could suffer serious negative financial consequences. Knowing this, they were bound by the charter to oversee legal and ethical compliance related to that strategy.  However the Company did not comply with relevant legal requirements and obtained a massive settlement through fraud, all on the watch of defendants Bindra, Chang, Tauscher, and Taylor.  There are only two possibilities: (a) these defendants knew of the Company's wrongdoing and, complicit in it, declined to halt it; or (b) did not know of the wrongdoing because they consciously declined to discharge their duties as they were required to under the charter with respect to this major, material, ongoing legal, regulatory, and compliance risk and thereby breached their fiduciary duties.  Either way, demand is excused as to defendants Bindra, Chang, Tauscher and Taylor because they face a substantial likelihood of liability.

**The Entire Board**

88.     The entire Board was responsible for reviewing significant enterprise risks such as the SONGS OII.  According to the Company's most recent proxy statement:

> Our Corporate Governance Guidelines provide that one of the Board's primary functions is to review the Company's enterprise risk management process and monitor strategic and emerging risks. The Board annually reviews key enterprise risks identified by management, such as financial, reputational, safety, physical and cyber security, and compliance risks, and monitors key risks through reports and discussions regarding key risk areas at Board meetings. The Board also focuses on specific strategic and emerging risks in periodic strategy reviews. The Board annually reviews corporate goals and approves capital budgets.

89.    As a result, the entire Board reviewed major enterprise risks, specifically including compliance risk, through reports and discussions at Board meetings.   At all times relevant hereto, the greatest risk confronting Edison involved potential liability arising out of the SONGS shutdown and OII.  Because of the enormous size, complex nature, and billions of dollars in controversy in the SONGS proceeding before the CPUC, the Board was required to, and did, review the significant compliance risks facing the Company in connection with this proceeding.   Clearly, one of the greatest compliance pitfalls arising from this proceeding related to *ex parte* communications with CPUC decisionmakers. However, the Board, even while it was reviewing these risks and aware of them, permitted the Company to operate without any formal policy governing *ex parte* contacts and legal compliance related thereto.   This was a breach of fiduciary duties committed by the eight Individual Defendants on the Board as of November 2014 when the Company entered the SONGS settlement agreement, defendants Craver, Bindra, Chang, Schlosberg, Stuntz, Tauscher, Taylor, and White.

90.    In addition, each of the Individual Defendants were at all relevant times subject to the Company's "Ethics and Compliance Code for Directors" (the "Code"), adopted December 8, 2011.   The Code states "[e]ach Director *must* adhere to the letter and the spirit of this Code, which offers guidance to Directors regarding *the content of their fiduciary duties* to the Company."   (Emphasis added).   The Code states:

**2. COMPLIANCE WITH APPLICABLE LAWS**

Directors *must* conduct all their financial, business and other activities *in full compliance with applicable laws, rules and regulations*. In addition, Directors must adhere to applicable portions of the following Company policies: Records Retention and Destruction, Disclosure, Foreign Corrupt Practices Act, Insider Trading, Workplace Harassment, and other policies as may be adopted and identified to them from time to time by the CECO or Company General Counsel.

* * *

**7. COMPLIANCE PROCEDURES**

If a Director becomes aware of facts that would cause a Director (including himself or herself) to be in violation of this Code, *the Director shall promptly inform the Chairman of the Board or the Lead Director, and the CECO or the General Counsel*. Following any substantiation of allegations, appropriate action will be determined by the Board or a duly authorized Board member or Committee.

**8. ENCOURAGING THE REPORTING OF ANY ILLEGAL OR UNETHICAL BEHAVIOR**

Directors should promote ethical behavior and take steps to ensure that the Company: (a) encourages employees to talk to supervisors, managers, the Ethics and Compliance department and other appropriate personnel when in doubt about the best course of action in a particular situation; (b) encourages employees to report violations of law, rules, regulations or the Company's Ethics and Compliance Code to their supervisor, the Ethics and Compliance department, or appropriate personnel; and (c) informs employees that the Company will not allow retaliation for reports made in good faith.

(Emphasis added.)

91.   The Code could not be more clear that all eight of the Individual Defendants were required to conduct the Company's business in compliance with applicable laws, rules, and regulations.  This meant complying with a fundamental

1  legal reporting requirement in the SONGS proceeding.  However, the Individual
2  Defendants permitted the Company to systematically, over a period of years, exert
3  concealed and fraudulent influence over CPUC decisionmakers.  At least a
4  majority of the Individual Defendants, White, Schlosberg, Bindra, Taylor, and
5  Craver, and upon information and belief, the other three director defendants as
6  well, specifically knew of improper *ex parte* communications.  Under the Code
7  they were *required* to take action to halt the practice.  Not only did they not halt
8  the practice, as evidenced by the dozens of subsequently disclosed *ex parte*
9  contacts that took place after the June 2013 email, but they also did not take action
10  to bring the Company into legal and regulatory compliance by requiring the
11  Company to disclose these contacts.  Even though they knew these contacts had
12  occurred and were concealed, the approved the Company's entry into the
13  settlement agreement predicated on this fraud.  This was a breach of fiduciary
14  duties.  As a result, demand is excused as to the entire Board because eight of the
15  nine current Board members face a substantial likelihood of liability due to their
16  breaches of fiduciary duties.

17      92.    As a result of the Director Defendants' conduct, the Company is now
18  the subject of securities class action lawsuits, at least one criminal probe by the
19  California Attorney General, consumer lawsuits, and numerous motions in the
20  SONGS proceeding seeking to reopen the settlement.  Any demand on the Edison
21  Board is futile for this reason as well.

22      93.    Plaintiff has not made any demand on the other shareholders of
23  Edison to institute this action since such demand would be a futile and useless act
24  for at least the following reasons:

25          (a)    Edison is a publicly held company with over 325 million shares
26  outstanding and thousands of shareholders;

27

28

---

42

(b)    making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)    making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I
## Breach of Fiduciary Duty

94.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

95.    Each defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Edison's business and affairs, particularly with respect to issues so fundamental as proper accounting controls.

96.    Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company. Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Edison.

97.    In breach of their fiduciary duties owed to Edison, defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

98.    In particular, the Individual Defendants knowingly, recklessly, or with gross negligence: (i) made or authorized misleading statements in the Company's public filings concerning the Company's internal controls and the SONGS proceeding; (ii) caused the Company to fail to implement adequate internal controls and procedures to ensure the that Edison complied its legal and regulatory

requirements; and (iii) permitted the Company to enter a settlement agreement procured through illegal acts and in violation of its reporting requirements .

99.    The Individual Defendants, as directors of the Company, owed Edison the highest duty of loyalty.  The Individual Defendants knowingly or recklessly breached their duty of loyalty by permitting the Company to fail in its legal compliance and reporting obligations and enter into a settlement which they knew or were reckless in not knowing was procured in violation of regulatory and legal requirements.

100.  As a direct and proximate result of defendants' breaches of their fiduciary obligations, Edison has sustained and continues to sustain significant damages. Including direct monetary damages, exposure to liability from securities litigation and criminal actions, and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II
## Abuse of Control

101.  Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

102.  Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Edison, for which they are legally responsible.

103.  As a direct and proximate result of defendants' abuse of control, Edison has sustained significant damages.

104.  As a direct and proximate result of defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Edison has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

105.  By reason of the foregoing, Edison has been damaged.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## COUNT III
## Violations of Section 14 of the Securities Exchange Act of 1934 (Derivatively)

106.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

107.   Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."   17 C.F.R. §240.14a-9.   Specifically, the Company's proxy statement filed in 2015 violated §14(a) and Rule 14a-9 because it failed to disclose that: (a) incentive compensation was being paid, at least partially, on the basis of the SONGS OII settlement that was obtained through fraud and in violation of applicable regulatory and legal reporting requirements; and (b) the Individual Defendants were not discharging their duties as described in the proxy statement.

108.   The proxy statement was false and misleading when issued because they failed to disclose (among other things) that the Company's controls over legal and regulatory compliance were deficient and had permitted a complete failure of reporting related to *ex parte* communications, as well as the payment of incentive compensation based on an fraudulently obtained settlement.   As a result, the proxy statement was materially false and misleading.

109.   The misrepresentations and omissions in the proxy statement were material to Company shareholders in voting on the proxy statement.   The proxy statement were an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties in connection with the wrongdoing alleged herein.

110.   The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, plaintiffs demand judgment on behalf of Edison as follows:

A. Declaring that plaintiffs may maintain this action on behalf of Edison and that plaintiffs are adequate representative of the Company;

B. Against all defendants, jointly and severally and in favor of Edison for the amount of damages sustained by the Company as a result of defendants' breaches of fiduciary duty, abuse of control, and violations of section 14 of the Securities Exchange Act of 1934;

C. Declaring that the defendants have breached and/or aided and abetted the breach of their fiduciary duties to Edison;

D. Directing the defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Edison and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

1. a proposal to strengthen the Company's disclosure and financial controls;

2. a proposal to strengthen Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

3. a provision to permit the shareholders of Edison to nominate at least three candidates for election to the Board; and

4. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1     E.    Determining and awarding to Edison exemplary damages, including

2 disgorgement of all profits, benefits, and other compensation obtained by

3 defendants,  in an amount necessary to punish defendants and to make an example

4 of defendants to the community according to proof at trial;

5     F.    Awarding Edison restitution from defendants, and each of them;

6     G.    Awarding plaintiffs the costs and disbursements of this action,

7 including reasonable attorneys' and experts' fees, costs, and expenses; and

8     H.    Granting such other and further equitable relief as this Court may

9 deem just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.

Dated: July 16, 2015          GLANCY PRONGAY & MURRAY LLP


By:  *s/ Louis N. Boyarsky*
LOUIS N. BOYARSKY
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:   (310) 201-9150
Facsimile:    (310) 201-9160
Email:        LBoyarsky@glancylaw.com

ROBERT I. HARWOOD
MATTHEW M. HOUSTON
BENJAMIN I. SACHS-MICHAELS
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
(212) 935-7400

*Attorneys for Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## EDISON INTERNATIONAL VERIFICATION

I, Shiva Y. Stein, hereby verify that I am familiar with the allegations in the Complaint, and that I have authorized the filing of the Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.


Date: 7/16/2015

_____
Shiva Y. Stein