1

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy (#134180)
Kara M. Wolke   (#241521)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
E-mail: info@glancylaw.com

2

3

4

5

6    *Liaison Counsel for Plaintiffs*

7    *[Additional Counsel on Signature Page]*

8                UNITED STATES DISTRICT COURT

9           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

10

11   IN RE EDISON INTERNATIONAL          )    Lead Case No. 3:15-cv-01581-BEN-KSC
     DERIVATIVE LITIGATION               )
12                                       )    (Derivative Action)
                                         )
13   ────────────────────────────       )
                                         )    **CONSOLIDATED DERIVATIVE**
14   This Document Relates To:           )    **COMPLAINT**
                                         )
15                ALL ACTIONS.           )    **JURY TRIAL DEMANDED**
                                         )
16   ────────────────────────────       )

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs Shiva Y. Stein, Roger Ekman, and Sally Hausken ("Plaintiffs"), by their undersigned attorneys, based on a comprehensive review of publicly available information, allege as follows:

## SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought for the benefit of nominal defendant Edison International ("Edison" or the "Company") against certain members of its Board of Directors (the "Board") who have engaged in and/or knowingly permitted unlawful conduct that has jeopardized a multi-billion dollar regulatory proceeding settlement and exposed the Company to hundreds of millions of dollars in additional liability.  Through this derivative action, Plaintiffs seek to remedy the Individual Defendants breaches of fiduciary duties, abuse of control, and violations of § 14 of the Securities Exchange Act of 1934.

2.      At all relevant times, the Company, through its wholly-owned subsidiary Southern California Edison ("SCE"), maintained a majority ownership stake in a nuclear generating facility located in south San Clemente, California, called the San Onofre Generating Station ("SONGS").   In 2010 and 2011, the Company installed replacement steam generators at SONGS.  On January 31, 2012, a leak was discovered in one of the steam generator tubes located in Unit 3 at SONGS, which ultimately led the Company to permanently retire Units 2 and 3 at the facility. The Company permanently shut down SONGS in June 2013.

3.      In the aftermath of the shutdown, on October 25, 2012, the California Public Utilities Commission ("CPUC") issued an Order Instituting Investigation ("OII") for the stated purposes of initiating an investigation into: (i) the causes of the SONGS outages; (ii) the Company's responses thereto; (iii) the future of the SONGS units; and (iv) the resulting effects on the provision of safe and reliable electric service at just and reasonable rates.[1]    Several consumer advocacy groups

---

[1]      As used herein, the term "OII" means the Order Instituting Investigation.  The terms "SONGS OII" and "SONGS OII proceeding" refer to the consolidated proceeding before the CPUC emanating from the issuance of the OII.

representing the interests of California public utility ratepayers also participated in the SONGS OII proceedings.  Among the key issues presented in these proceedings was the proper allocation of the costs associated with the SONGS failure between the public utility companies and California ratepayers.

4. On November 20, 2014, the CPUC entered a decision approving the settlement reached by the parties to the SONGS OII (the "November 20, 2014 Decision").  The primary terms of the settlement provided for ratepayers to pay approximately $3.3 billion in costs that included, *inter alia*, those attributable to replacement power purchased by the utility companies for ratepayers in the aftermath of the SONGS outage and the recovery of certain undepreciated net investments in SONGS assets, such as the base plant located at the facility.  The settlement also provided that the utilities would, *inter alia*, provide ratepayer refunds and credits of approximately $1.45 billion.

5. The November 20, 2014 Decision also approved a provision of the settlement agreement that resulted in a "multi-year project, undertaken by the University of California (or a UC-affiliated entity), funded by shareholder dollars, to spur immediate practical, technical development of devices and methodologies to reduce emissions at existing and future California power plants tasked to replace the lost SONGS generation."  The settlement describes this project as the "Greenhouse Gas Research and Reduction program," and directs Edison to donate to the project $4 million of shareholder funds annually for a period of up to five years.

6. The November 20, 2014 Decision found that Edison, as one of the settling parties, presented the settlement as a fair compromise of contested issues which was the result of "hard fought" negotiations in which the Company "compromised substantially" from positions taken throughout the SONGS OII proceeding.

7. The true nature of the Company's involvement in the SONGS OII negotiations, however, began to surface on February 9, 2015 by means of a Late-

Filed Notice of *Ex Parte* Communication filed by Edison in the SONGS OII proceeding (the "February 9, 2015 Filing").  Since that time, the Company has disclosed hundreds of pages of previously undisclosed *ex parte* communications that reveal a continuous and pervasive effort by the Company to manipulate the outcome of the SONGS settlement through improperly concealed *ex parte* interactions with CPUC decision makers and personnel.  Despite the Company's knowledge of its duty under CPUC rules to disclose such *ex parte* communications in a prompt and complete manner, the Company, with the explicit knowledge and approval of the Board, instead chose to illegally conceal these voluminous communications from the other parties to the SONGS OII proceeding.

8.     The most damning of these *ex parte* communications involves a March 26, 2013 meeting in which a senior SCE executive engaged in an extensive and substantive discussion with the then-president of the CPUC concerning the framework of a SONGS settlement that would be most advantageous to the Company.  When a search warrant was executed on the home of the then-president of the CPUC in January 2015, investigators from the Office of the Attorney General – State of California (the "California Attorney General") discovered several pages of notes from the March 26, 2013 meeting that were written by the SCE executive, with annotations by the then-president of the CPUC.  This meeting took place more than two months *before* the commencement of settlement negotiations in the SONGS OII in June 2013.

9.     The disclosure of these *ex parte* communications by the Company sent the consumer advocacy groups that were parties to the SONGS OII settlement into an uproar.  These groups have, *inter alia*, requested that the CPUC impose sanctions on the Company, impose a ban on all communication between the Company and the CPUC regarding SONGS, and modify or reopen the SONGS investigation and settlement.  The consumer advocacy groups assert, among other things, that the Company's failure to timely and completely disclose its *ex parte* communications

with the CPUC constituted fraud and resulted in a settlement agreement containing terms materially different than those that would have been agreed to had the *ex parte* communications been properly disclosed.

10.    On October 27, 2015, the administrative law judge presiding over the SONGS OII proceeding issued a proposed order imposing on the Company a $16,740,000 fine arising from CPUC rule violations stemming from Edison's nefarious *ex parte* communication practices.   The decision does not address the impact of these violations on the SONGS OII settlement.  Consequently, the SONGS OII settlement remains in jeopardy, and Edison could be required to pay additional hundreds of millions of dollars as part of the proceeding.

11.    In addition to the fallout in the SONGS OII proceeding, Edison is currently under investigation by the California Attorney General as a result of, among other things, the *ex parte* communications as described above.  On or about July 6, 2015, the California Attorney General executed multiple search warrants against the Company, including at its headquarters outside Los Angeles, and warrants on the CPUC's headquarters.   These recent warrants sought documents involving at least two dozen individuals throughout both organizations.  Individuals in the highest ranks of leadership at Edison and the CPUC are included in these warrants.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this Consolidated Derivative Complaint states a federal question: violations of § 14(a) of the Securities Exchange Act of 1934.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not collusive so as to confer jurisdiction on a Court of the United States.

13.     In addition, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that the Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of costs and interests.

14.     Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants resides in this District, Defendants have engaged in activities that had an effect in this District and are directly related to the wrongdoing alleged herein.

**PARTIES**

15.     Plaintiff Shiva Y. Stein, a citizen of New York, is a shareholder of the Company and has been a shareholder of Edison continuously at all times since June 2014.

16.     Plaintiff Roger Ekman, a citizen of Minnesota, is a shareholder of the Company and has been a shareholder of Edison continuously at all times since January 2001.

17.     Plaintiff Sally Hausken, a citizen of Minnesota, is a shareholder of the Company and has been a shareholder of Edison continuously at all times since August 2010.

18.     Nominal Defendant Edison is an entity incorporated under the laws of the State of California, maintains its principal executive offices at 2244 Walnut Grove Avenue, Rosemead, California, and is therefore a citizen of California. Edison is the parent holding company of SCE, which is a public utility primarily engaged in the business of supplying and delivering electricity to the southern California region.

19.     Defendant Theodore F. Craver, Jr. ("Craver"), a citizen of California, has served as Edison's Chief Executive Officer ("CEO") and President and as the Chairman of the Board since 2008.  Craver has served as a director of Edison since 2007 and as a director of SCE since 2008.

20.     Defendant Jagjeet S. Bindra ("Bindra"), a citizen of Texas, has served as a director of Edison and SCE since 2010. At all relevant times, Bindra was a member of the Audit Committee and the Finance, Operations & Safety Oversight Committee.[2]

21.     Defendant Vanessa Chang ("Chang"), a citizen of Texas, has served as a director of Edison and SCE since 2007.  At all relevant times, Chang was the Chair of the Audit Committee and a member of the Compensation & Executive Personnel Committee.

22.     Defendant Richard T. Schlosberg, III ("Schlosberg"), a citizen of Texas, has served as a director of Edison and SCE since 2002.  At all relevant times, Schlosberg was a member of the Compensation & Executive Personnel Committee and he currently serves as Chairman of the Nominating/Corporate Governance Committee.

23.     Defendant Linda G. Stuntz ("Stuntz"), a citizen of Virginia, has served as director of Edison and SCE since 2014.  At all relevant times, defendant Stuntz was a member of the Finance, Operations & Safety Oversight Committee and the Nominating/Corporate Governance Committee.

24.     Defendant Ellen O. Tauscher ("Tauscher"), a citizen of the District of Columbia, has served as a director of Edison and SCE since 2013.  At all relevant times, Tauscher was a member of the Audit Committee and the Finance, Operations & Safety Oversight Committee.

25.     Defendant Peter J. Taylor ("Taylor"), a citizen of California, has served as director of Edison and SCE since 2011.  At all relevant times, Taylor was a member of the Audit Committee and the Compensation & Executive Personnel Committee.

---

[2]     According to the Company's public filings, it is the usual practice that meetings of the Boards and Board committees of Edison and SCE are held jointly. The Board committee composition is the same for Edison and SCE.

26.     Defendant Brett White ("White"), a citizen of California, has served as director of Edison and SCE since 2007 and as Lead Director since 2014. At all relevant times, White was Chair of the Compensation and Executive Personnel Committee and a member of the Nominating/Corporate Governance Committee.

27.     The defendants named in paragraphs 19 through 26 are referred to herein as the "Individual Defendants."[3]

## SUBSTANTIVE ALLEGATIONS

**SONGS and the OII Settlement**

28.     SONGS is a retired nuclear power plant located in south San Clemente, California.   The Company owns a 78% stake in SONGS and San Diego Gas & Electric ("SDG&E") owns a 20% interest in the facility.   SONGS contains three units: Units 1, 2, and 3.   In 2006, Edison advised the United States Nuclear Regulatory Commission ("NRC") of its intention to replace the steam generators for Units 2 and 3.   Edison obtained the agreement of the CPUC to charge California ratepayers for the replacement steam generators so long as Edison applied to do so six months after SONGS returned to commercial operation.

29.     The replacement steam generators at Units 2 and 3 were put into operation in January 2010 and February 2011, respectively, and SONGS returned to commercial operation in February 2011.   However, upon information and belief, Edison did not, and has not, submitted an application with the CPUC to charge California ratepayers for the replacement steam generators.

30.     On January 31, 2012, a leak was discovered in one of the steam generator tubes located in Unit 3 at SONGS, which ultimately led the Company to permanently retire Units 2 and 3 at the facility.   These failures rendered SONGS permanently inoperable in June 2013.

---

[3]     Also a member of the Board, but not named as a defendant, is William P. Sullivan ("Sullivan").   Sullivan is not named as a defendant at this time because he joined the Board in mid-April 2015.

31.   On March 19, 2012, the NRC dispatched an inspection team to gather facts regarding the SONGS failures.  The NRC's investigation culminated in a report that found, among other things, design flaws in the replacement steam generators at SONGS.

32.   There were enormous costs associated with the installation and fabrication of the new steam generators, the work required to put them into "preservation mode" after they failed, and the purchase of power to replace the power lost due to the SONGS outage.  California ratepayers were required to bear some of this expense.  As such, the SONGS outages resulted in the filing of several ratesetting proceedings before the CPUC by and between various consumer advocacy groups, SCE, SDG&E, Mitsubishi Heavy Industries (the manufacturer of the failed replacement steam generators), and various insurance carriers.  Among the issues presented in these proceedings was the proper allocation of the costs associated with the SONGS failure between the public utility companies and California ratepayers.

33.   On October 25, 2012, the CPUC issued the OII and commenced an investigation into, among other things, SCE's role in the SONGS outages. The stated purposes of the OII were to investigate: (i) the causes of the SONGS outages; (ii) the Company's responses thereto; (iii) the future of the SONGS unit; and (iv) the resulting effects on the provision of safe and reliable electric service at just and reasonable rates.  The OII was issued by, among other people, then-President of the CPUC Michael Peevey ("Peevey") and then-Commissioner of the CPUC Michael Florio ("Florio").  Peevey is a former President of Edison and SCE, and served as a senior executive at the Company beginning in 1984.

34.   In addition, the OII consolidated the various ratesetting proceedings into a single matter.  Parties to the OII include SCE, SDG&E, the Officer of Ratepayer Advocates ("ORA"), The Utility Reform Network ("TURN") and the Alliance for Nuclear Responsibility ("ANR").

35.     On March 27, 2014, the Company entered into a settlement agreement with TURN, ORA, SDG & E, Coalition of California Utility Employees, and Friends of the Earth (together, the "Settling Parties").

36.     On April 3, 2014, the Settling Parties filed a joint motion in the OII for adoption of the settlement agreement that, if approved, would resolve all issues involved in the OII proceedings.  All interested parties, however, did not agree to the settlement, and as such, commentary on and objections to the settlement were lodged in the SONGS OII proceeding.

37.     On September 5, 2014, the CPUC issued an Assigned Commissioner and Administrative Law Judges' Ruling Requesting Settling Parties to Adopt Modifications to Proposed Settlement Agreement (the "Request to Adopt Modifications").   The Request to Adopt Modifications was issued by then-Commissioner Florio and Administrative Law Judges Melanie M. Darling ("ALJ Darling") and Kevin R. Dudney ("ALJ Dudney").   Notably, the Request to Adopt Modifications asked the Settling Parties to:

> [A]dd a provision which will result in a multi-year project, undertaken by the University of California (or a UC-affiliated entity), funded by shareholder dollars, to spur immediate practical, technical development of devices and methodologies to reduce emissions at existing and future California power plants tasked to replace the lost SONGS generation.

Specifically, the Request to Adopt Modification provided that SCE would donate $4 million annually, for a period of up to five years, with all such donations deriving from shareholder funds.   The foregoing project is hereinafter referred to as the "Greenhouse Gas Initiative."

38.     On September 19, 2014, the Settling Parties filed responses to the Request to Adopt Modifications acknowledging that they intended to accept the CPUC's proposed modifications to the settlement agreement, including the Greenhouse Gas Initiative.  On September 24, 2014, the Settling Parties submitted an amended settlement agreement in compliance with the Request to Adopt Modifications.

39.   On November 20, 2014, the CPUC approved the amended settlement agreement.   The primary terms of the settlement provided for ratepayers to pay approximately $3.3 billion in costs that included, *inter alia*, those costs attributable to replacement power purchased by the utility companies for ratepayers in the aftermath of the SONGS outage and the recovery of certain undepreciated net investments in SONGS assets, such as the base plant located at the facility.   The settlement also provided that the public utilities would provide ratepayer refunds and credits of approximately $1.45 billion.   The settlement further provided for the creation of the Greenhouse Gas Initiative, which would run for a term of five years and be funded by SCE in the amount of $4 million annually.

40.   The November 20, 2014 Decision found that SCE, as one of the settling parties, presented the settlement as a fair compromise of contested issues which was the result of "hard fought" negotiations in which it "compromised substantially" from positions taken throughout the OII proceeding.

### *Ex Parte* Communications

41.   Proceedings before the CPUC are governed by the Public Utilities Code and the CPUC's Rules of Practice and Procedure (the "Rules").   The Code and Rules provide specific directives regarding *ex parte* communications in CPUC proceedings such as the SONGS OII.   Rule 8.1(c) generally defines an "*ex parte* communication" as a written or oral communication between an "interested person" and a CPUC "decision-maker" about a substantive issue before the CPUC that is stated or provided outside the formal proceeding process.   A "decision-maker" can be a CPUC Commissioner or an Administrative Law Judge.   An "interested person" can mean parties in a CPUC proceeding.   *Ex parte* communications in ratesetting proceedings such as the SONGS OII are subject to the stringent reporting requirements of Rule 8.4, which provides:

> Ex parte communications that are subject to these reporting requirements shall be reported by the interested person, regardless of whether the communication was initiated by that interested person.

Notice of ex parte communications shall be filed within three working days of the communication. . . .

42.     CPUC proceedings adhere to specific legal procedures to ensure fairness, including how and when someone may communicate substantive matters with CPUC decision-makers.  The purpose of the CPUC's *ex parte* communication rules is to ensure that all parties in a proceeding before the CPUC have equal access to information.

43.     Undoubtedly, the Company was aware of its obligations under the Code and the Rules.  The OII states:

> Communications with decision makers and advisors in this rulemaking are governed by Article 8 of the Rules of Practice and Procedure. . . . Specifically, Rule 8.3(c) states that *ex parte* communications in ratesetting proceedings are subject to the restrictions stated in Rule 8.3, and the reporting requirements set forth in Rule 8.4.

44.     Further confirming the Company's awareness of the rules, on September 25, 2014, nearly two months prior to the November 20, 2014 settlement conference, Edison's Chief Ethics and Compliance Officer Mike Montoya, SCE's General Counsel Russell Schwartz, and SCE's Senior Vice President, Regulatory Affairs R.O. Nichols sent an e-mail to Company personnel stating: "While we are well aware of the CPUC's *ex parte* communications rules, this situation makes clear that awareness of the rules is not enough."

45.     Despite the Company's knowledge of its reporting obligations under the CPUC Rules and the OII, Edison, with the explicit knowledge and approval of the Board, nonetheless failed to timely report its numerous *ex parte* communications with CPUC decision-makers and personnel.  This failure is illustrated by, among other things, a SCE policy that was included as a hyperlink to a press release the Company issued on February 9, 2015.  That document, dated February 2, 2015, is an internal company policy titled "Communications and Interactions with the California Public Utilities Commission."  An information field at the top of the document states

"Supersedes[:] N/A – New Policy," which strongly implies that prior to February 2, 2015, SCE lacked *any* policy regarding *ex parte* communications with the CPUC.

**Misleading Statements**

46.    Throughout the relevant period beginning on July 31, 2014, Edison failed to disclose that the Company's controls over legal and regulatory compliance were woefully deficient and had permitted a complete failure of reporting relating to its *ex parte* communications with the CPUC, as well as the payment of incentive compensation to certain of the Company's executive officers based upon the fraudulently obtained SONGS OII settlement.

47.    On July 31, 2014, when Edison filed with the U.S. Securities and Exchange Commission ("SEC") its Form 10-Q for the second quarter of 2014 (the "Second Quarter 2014 10-Q"). For the quarter, the Company reported net income of $566 million, or $1.63 per diluted share, on revenue of $3.02 billion, compared to a net loss of $70 million, or $0.29 per diluted share, on revenue of $3.05 for the same period in the prior year.   The Second Quarter 2014 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act, 15 U.S.C.S. § 7241(a), ("SOX") by defendant Craver stating that the financial information contained in the Second Quarter 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.  In the Second Quarter 2014 10-Q, the Company stated, in part, that:

> ***CPUC Proceedings and Proposed Settlement***
>
> In October 2012, the CPUC issued an Order Instituting Investigation ("OII") that consolidated all San Onofre issues in related CPUC regulatory proceedings to consider appropriate cost recovery for all San Onofre costs, including among other costs, the cost of the steam generator replacement project, substitute market power costs, capital expenditures, and operation and maintenance costs.
>
> On March 27, 2014, SCE entered into a settlement agreement (the "San Onofre OII Settlement Agreement") with The Utility Reform Network ("TURN"), the CPUC's Office of Ratepayer Advocates ("ORA") and SDG&E, which was later joined by the Coalition of California Utility Employees ("CUE") and Friends of the Earth ("FOE") (together, the "Settling Parties"). If implemented, the San Onofre OII Settlement

Agreement will constitute a complete and final resolution of the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project ("SGRP") at San Onofre and the related outage and subsequent shutdown of San Onofre. The San Onofre OII Settlement Agreement does not affect proceedings before the NRC or proceedings related to recoveries from third parties described below, but does describe how shareholders and customers will share any potential recoveries. Implementation of the San Onofre OII Settlement Agreement is subject to the approval of the CPUC. The parties to the San Onofre OII Settlement Agreement have agreed to exercise their best efforts to obtain CPUC approval. The San Onofre OII Settlement Agreement is subject to termination by any of the Settling Parties if the CPUC has not approved it within six months of submission, but there can be no certainty of when or what the CPUC will actually decide.

*Disallowances, Refunds and Rate Recoveries*

If the San Onofre OII Settlement Agreement is approved, SCE will not be allowed to recover in rates its capitalized costs for the SGRP as of February 1, 2012 or a return on such investment after such date. As of February 1, 2012, SCE's net book value in the SGRP was approximately $597 million. Additionally, SCE will not be allowed to recover in rates approximately $99 million of incremental inspection and repair costs incurred for the replacement steam generators ("RSGs") in 2012 that were in excess of CPUC-authorized operations and maintenance expense. These costs, net of invoices paid, were previously expensed in SCE's 2012 financial results, although they remain subject to recovery from the supplier of the RSGs. Neither will SCE be allowed to recover in rates provisionally authorized operations and maintenance expense in 2013 that exceeds amounts included in recorded operations and maintenance expense (including severance and incremental repair and inspection costs); such excess had not been recognized in 2013 earnings. Subject to the foregoing, SCE will be authorized to recover in rates its remaining investment in San Onofre, including base plant, materials and supplies, nuclear fuel inventory and contracts and construction work in progress ("CWIP"), generally over a ten-year period commencing February 1, 2012. Additionally, SCE will be authorized to recover in rates its provisionally authorized operations and maintenance expenses for 2012, recorded costs for the 2012 refueling outage of Unit 2, recorded operations and maintenance expenses for 2013, and recorded operations and maintenance expenses for 2014 subject to customary prudency review. Finally, SCE will also be authorized to recover in rates through its fuel and purchased power balancing account ("ERRA") all costs incurred to purchase electric power in the market related to the outage and shutdown of San Onofre, and to recover by December 31, 2015 any San Onofre-related ERRA undercollections. Estimated market power costs through June 6, 2013 (the date of San Onofre's retirement) were approximately $680 million using the methodology followed in the OII. To the extent that amounts otherwise recoverable in rates under the San Onofre OII Settlement Agreement are recovered from SCE's Decommissioning Trust as a decommissioning cost, the amounts otherwise recoverable in rates will be reduced with no impact on earnings.

* * *

*Accounting and Financial Impact*

Due to the decision to early retire San Onofre Units 2 and 3, GAAP required reclassification of the amounts recorded in property, plant and equipment and related tangible operating assets to a regulatory asset to the extent that management concluded it was probable of recovery through future rates. Regulatory assets may also be recorded to the extent management concludes it is probable that direct and indirect costs incurred to retire Units 2 and 3 as of each reporting date are recoverable through future rates. In accordance with these requirements and as a result of its decision to retire San Onofre Units 2 and 3, SCE reclassified $1,521 million of its total investment in San Onofre at May 31, 2013 to a regulatory asset ("San Onofre Regulatory Asset") and recorded an impairment charge of $575 million ($365 million after-tax) in the second quarter of 2013. As of December 31, 2013, SCE had recorded a net regulatory asset of approximately $1.3 billion, comprised of $1.56 billion of property, plant and equipment, less $266 million for estimated refunds of authorized revenue recorded in excess of SCE's costs of service.

As a result of the execution of the San Onofre OII Settlement Agreement by the Settling Parties, SCE has concluded that the outcome of the OII that is more likely than any other outcome is approval and implementation of the San Onofre OII Settlement Agreement, although approval by the CPUC remains uncertain. As a result, in the first quarter of 2014, SCE recorded an additional pre-tax charge of approximately $231 million (approximately $96 million after-tax). Including the amounts recorded during the first quarter of 2014 and the amounts previously recorded in 2013, the total impact of the San Onofre OII settlement is estimated at $806 million (approximately $461 million after-tax).

* * *

*San Onofre OII Settlement Agreement Procedure*

On April 3, 2014, the Settling Parties filed a motion in the OII requesting the CPUC to approve the San Onofre OII Settlement Agreement without change, find the Settlement Agreement reasonable and expedite consideration of the San Onofre OII Settlement Agreement in order to provide the benefits of it as soon as possible. The Settling Parties also urged the CPUC to stay further proceedings in the OII pending a determination on the San Onofre OII Settlement Agreement and to withdraw the November 19, 2013 Proposed Decision on Phase 1 and Phase 1A issues in the OII. During the pendency of proceedings regarding the San Onofre OII Settlement Agreement, the Settling Parties are further bound to support and mutually defend the San Onofre OII Settlement Agreement in its entirety, oppose any modifications proposed by any non-settling party to the OII unless all Settling Parties agree, and cooperate reasonably on all submissions. The Settling Parties further agree to review any CPUC orders regarding the San Onofre OII Settlement Agreement to determine if the CPUC has changed or modified it, deleted a term or imposed a new term. If any Settling Party

is unwilling to accept any such change, modification, deletion or addition of a new term, then the Settling Parties will negotiate in good faith to seek a resolution acceptable to all Settling Parties. If they are unable to resolve the matter to the satisfaction of all Settling Parties or to obtain prompt CPUC approval of an agreed upon resolution, then any Settling Party can terminate the Settlement Agreement upon prompt notice.

Under CPUC rules, parties in the OII have had an opportunity to comment on the San Onofre OII Settlement Agreement, and the CPUC held an evidentiary hearing on May 14, 2014 and a public participation meeting on June 16, 2014, at which various intervenors who were not Settling Parties opposed the proposed settlement and others supported it. Following conclusion of the public participation meeting, approval of the San Onofre OII Settlement Agreement was submitted to an Administrative Law Judge to render a proposed decision for further consideration by the CPUC. CPUC rules do not provide for any fixed time period for the CPUC to act on the San Onofre OII Settlement Agreement. Pursuant to the CPUC's rules, no settlement becomes binding on the parties to it unless the CPUC approves the settlement based on a finding that it is reasonable in light of the whole record, consistent with law, and in the public interest. The CPUC has discretion to approve or disapprove a settlement, or to condition its approval on changes to the settlement, which the parties may accept or reject.

48.     On October 28, 2014, Edison filed with the SEC its Form 10-Q for the third quarter of 2014 (the "Third Quarter 2014 10-Q").   For the quarter, the Company reported net income of $508 million, or $1.46 per diluted share, on revenue of $4.36 billion, compared to a net income of $463 million, or $1.34 per diluted share, on revenue of $3.96 billion for the same period in the prior year.  The Third Quarter 2014 10-Q contained signed certifications pursuant to SOX by defendant Craver stating that the financial information contained in the Third Quarter 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.   In the Third Quarter 2014 10-Q also disclosed in part:

### *CPUC Proceedings and Proposed Settlement*

In October 2012, the CPUC issued an Order Instituting Investigation ("OII") that consolidated all San Onofre issues in related CPUC regulatory proceedings to consider appropriate cost recovery for all San Onofre costs, including among other costs, the cost of the steam generator replacement project, substitute market power costs, capital expenditures, and operation and maintenance costs.

On September 23, 2014, SCE entered into an Amended and Restated Settlement Agreement (the "San Onofre OII Amended Settlement Agreement") with The Utility Reform Network ("TURN"), the CPUC's Office of Ratepayer Advocates ("ORA"), SDG&E, the Coalition of California Utility Employees ("CUE"), and Friends of the Earth ("FOE") (together, the "Settling Parties"). If implemented, the San Onofre OII Amended Settlement Agreement will constitute a complete and final resolution of the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project ("SGRP") at San Onofre and the related outage and subsequent shutdown of San Onofre. The Settling Parties agreed to amend the Settlement Agreement that was originally entered into in March 2014 in response to an Assigned Commissioner's and Administrative Judges' Ruling that was issued on September 5, 2014. The San Onofre OII Amended Settlement Agreement does not affect proceedings before the NRC or proceedings related to recoveries from third parties described below, but does describe how shareholders and customers will share any potential recoveries. Implementation of the San Onofre OII Amended Settlement Agreement is subject to the approval of the CPUC. The San Onofre OII Amended Settlement Agreement is subject to termination by any of the Settling Parties if the CPUC has not approved it by December 23, 2014. On October 9, 2014, the Administrative Law Judges in the OII issued a Proposed Decision approving the San Onofre OII Amended Settlement Agreement. Under applicable rules, the CPUC cannot render a final decision for at least thirty days following the date of the Proposed Decision, but there can be no certainty of when or what the CPUC will actually decide. The parties to the San Onofre OII Amended Settlement Agreement have agreed to exercise their best efforts to obtain CPUC approval.

* * *

*San Onofre OII Settlement Agreement Procedure*

On October 9, 2014, the Administrative Law Judges in the San Onofre OII issued a Proposed Decision approving the San Onofre OII Amended Settlement Agreement. Under its rules, the CPUC may not render a final decision for at least thirty days following the issuance of the Proposed Decision, but the rules do not otherwise provide for any fixed time period for the CPUC to act on the San Onofre OII Amended Settlement Agreement. Pursuant to the CPUC's rules, no settlement becomes binding on the parties to it unless the CPUC approves the settlement based on a finding that it is reasonable in light of the whole record, consistent with law, and in the public interest. The CPUC has discretion to approve or disapprove a settlement, or to condition its approval on changes to the settlement, which the parties may accept or reject.

Accordingly, there can be no assurance regarding the timing of any CPUC decision or that the CPUC will approve the San Onofre OII Amended Settlement Agreement or refrain from making changes to it that are not acceptable to all the Settling Parties. Thus, there can be no assurance that the OII proceeding will provide for recoveries as currently estimated by SCE in accordance with the San Onofre OII Amended Settlement Agreement, including the recovery of costs recorded as a regulatory asset, or that the CPUC does not order refunds

to customers above those contemplated by the San Onofre OII Amended Settlement Agreement. Therefore, the amount recorded for the San Onofre Regulatory Asset is subject to further change based upon future developments and the application of SCE's judgment to those events.

49.    On November 20, 2014, the amended settlement of the SONGS OII was approved by the CPUC.

**The Company's Very Late Disclosure of the Warsaw Meeting and the Immediate Fallout in the SONGS OII Proceeding**

50.    Despite the Company's knowledge of its reporting obligations under the Rules and the OII, Edison, with the explicit knowledge and approval of the Board, engaged in numerous undisclosed, substantive *ex parte* communications with CPUC personnel throughout the SONGS OII proceeding.

51.    The most damning of these *ex parte* communications took place on March 26, 2013 between SCE Executive Vice President of External Relations Stephen Pickett ("Pickett") and then-President of the CPUC Peevey at a hotel in Warsaw, Poland (the "Warsaw Meeting").  The Warsaw Meeting took place more than two months before settlement negotiations commenced in the SONGS OII proceedings in mid- to late-June 2013.  Pickett, who is also the former General Counsel of the Company, retired from the Company on November 30, 2013.  The notes from the Warsaw Meeting were uncovered during the execution of a search warrant by the California Attorney General on Peevey's home in January 2015.

52.    Edison did not disclose the Warsaw Meeting until the February 9, 2015 Filing.  Notably, the February 9, 2015 Filing did not occur until after: (i) Peevey had resigned from the CPUC, effective December 31, 2014; (ii) the California Attorney General had seized the Warsaw Meeting notes during the January 2015 raid on Peevey's home; and (iii) the Company had purportedly implemented its first *ex parte* communication policy on or around February 2, 2015.

53.    In the February 9, 2015 Filing, Edison revealed that Pickett had recently provided the Company with further information about the Warsaw Meeting, which "may have crossed into a substantive communication."  Edison further revealed that

Pickett's notes from the Warsaw Meeting included a set of possible settlement terms, provided by Peevey, concerning how costs might be allocated if SONGS were to permanently shut down.[4]   The Company also disclosed that Peevey retained the notes, which were presumably in the hands of the California Attorney General by the time of the February 9, 2015 Filing.

54.    Also on February 9, 2015, Edison issued a press release announcing its "Strengthened Policies Governing Contacts with the Commission."   The press release included a copy of the aforementioned policy titled "Communications and Interactions with the California Public Utilities Commission."   As discussed in ¶ 45 above, one of the information fields at the top of the document states: "Supersedes[:] N/A – New Policy," which leads to the unavoidable inference that this was the first *ex parte* communication policy implemented by the Company.   The press release also included a copy of the Company e-mail discussed in ¶ 44 above.

55.    The very next day, recognizing Edison's flagrant disregard for CPUC's *ex parte* communication rules, ANR filed a motion for sanctions against the Company in the SONGS OII proceeding.   The brief filed in support of ANR's motion for sanctions reads states:

> By failing to timely disclose the *"approximately"* 30-minute [Warsaw Meeting], at which SCE provided a status update on its SONGS Unit 2 restart efforts and responded to President Peevey's comments regarding an acceptable resolution to [the SONGS OII], SCE severely prejudiced [ANR] and all other parties to this proceeding.   Rule 8.3(c)(2) required that all other [SONGS OII] parties be afforded *"an individual meeting of a substantially equal period of time"* with President Peevey.
>
> The severity of this violation is self-evident: Unit 2 restart efforts were a core subject of Phase 1 of the Commission's investigation, and SCE now admits discussing *"a framework for a possible resolution of the [entire] Order Instituting Investigation"* with the Commission President nearly seven weeks before the Phase 1 evidentiary hearings even commenced.

(Emphasis in original) (footnotes omitted).

---

[4]   As discussed in ¶ 30 above, SONGS was rendered permanently inoperable in June 2013.

56.     In that same filing, ANR revealed strong evidence of previous *ex parte* communications involving Edison that were alluded to in a June 7, 2013 analyst call in which Craver participated:

> Despite [ANR] calling attention to the oversight in its June 28, 2013 Phase 1 Opening Brief, SCE has yet to report the ex parte communications between Edison International CEO Ted Craver and President Peevey which Mr. Craver acknowledged in his June 7, 2013 teleconference with financial analysts concerning the permanent shutdown of SONGS. As Mr. Craver interjected into an exchange with a Morgan Stanley analyst, *"Steve, this is Ted Craver I want to just add a little bit in here. The last couple of days I've been on the phone with the Governor, as well as President Peevey."* While phone calls with the Governor are not reportable, communications with President Peevey are covered by CPUC Rule 8.4.

> SCE's late-filed Notice of Ex Parte Communication concerning Mr. Pickett's Warsaw meeting with President Peevey just 10 ½ weeks earlier, and its focus on *"a framework for a possible resolution of the [entire] Order Instituting Investigation,"* certainly raises questions about whether Mr. Craver's phone calls addressed [SONGS OII] subject matter. The likelihood that they did is enhanced by the following exchange between Mr. Craver and Bloomberg News reporter Mark Chediak in a telephonic press conference with journalists on June 7, 2013 subsequent to the financial analyst teleconference:

> **Mark Chediak**
> *A question here regarding certain possible head to shareholders here. You guys disclosed some figures in your release. But what is – ultimately, what could shareholders ultimately be on the hope for here regarding cost recovery? It sounds like that's going to be decided largely by the CPUC. And kind of the second part of that question is when do you see some clarity from the CPUC on cost recovery?*

> **Theodore F. Craver** – *Chairman, Chief Executive Officer and President Yes, great questions. So let me try it this way. In terms of the final determination . . . that will be a matter of resolving the order institution investigation on [SONGS] that the [CPUC] started back in November of last year. So . . . there's no way to have an exact idea of what potential liability to shareholders could be until we get all the way through that process. **I saw earlier this morning that President Peevey from the [CPUC] has urged, I think, it was the word he used, parties to get together and try to work out some sort of a settlement of all of these items and bring it to the commission.** But whether it goes through that kind of a process, a settlement process, or it goes through the standard litigated process, in the OII proceeding, we will end up eventually with an answer to the question...*

(Emphasis in original) (footnotes omitted).

Notably, the communications referenced by Craver took place weeks prior to the beginning of formal settlement negotiations in the SONGS OII in mid- to late-June

2013.    The  brief  filed  in  support  of  ANR's  motion  for  sanctions  ominously concludes:

> The  unavoidable  inferences  raised  by  Mr.  Craver's  June  7,  2013 comments,  when  illuminated  by  SCE's  late-filed  Notice  of  Mr.  Pickett's ex  parte  communication,  not  to  mention  the  trumpeted  applicability  of the  New  Policy  to  Edison  International  employees,  suggest  that  SCE  has considerably  more  disclosures  to  make  before  the  scope  of  its  violations of  Rule  8.4  (and  consequently  Rule  1.1)  can  be  determined.

57.    On February 24, 2015, Edison filed with the SEC its Form 10-K for the fourth quarter and fiscal year 2014 (the "2014 10-K").   For the fourth quarter, net income was $448 million, or $1.27 per diluted share, on revenue of $3.11 billion, compared to net income of $326 million, or $0.92 per diluted share, on revenue of $2.94 billion for the same period in the prior year.   For the full year, net income was $1.72 billion, or $4.89 per diluted share, on revenue of $13.41 billion, compared to net income of $1.02 billion, or $2.78 per diluted share, on revenue of $12.58 billion for 2013.   The 2014 10-K contained a signed certifications pursuant to SOX by defendant Craver stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting. The 2014 10-K carries the signatures of defendants Bindra, Chang, Craver, Schlosberg, Stuntz, Sutton, Tauscher, Taylor, and White, and discloses in part:

> In October 2012, the CPUC issued an OII that consolidated all San Onofre  issues  in  related  CPUC  regulatory  proceedings  to  consider appropriate  cost  recovery  for  all  San  Onofre  costs,  including  among other  costs,  the  cost  of  the  steam  generator  replacement  project, substitute  market  power  costs,  capital  expenditures,  and  operation  and maintenance costs.

> On November 20, 2014, the CPUC approved the Amended and Restated Settlement  Agreement  (the  "San  Onofre  OII  Settlement  Agreement") that SCE had entered into with TURN, the ORA, SDG&E, the Coalition of California Utility Employees, and Friends of the Earth (together, the "Settling Parties"). The San Onofre OII Settlement Agreement resolved the CPUC's OII and related proceedings regarding the Steam Generator Replacement  Project  at  San  Onofre  and  the  related  outage  and subsequent shutdown of San Onofre. The San Onofre OII Settlement Agreement does not affect proceedings related to recoveries from third parties  described  below,  but  does  describe  how  shareholders  and customers  will  share  any  potential  recoveries.  SCE  has  recorded  the

effects of the San Onofre  OII Settlement Agreement. Such amounts do not reflect any recoveries from third parties by SCE.

A lawsuit challenging the CPUC's authority to permit rate recovery of San Onofre costs and an application for rehearing of the CPUC's decision approving the San Onofre OII Settlement Agreement were filed in November and December 2014, respectively. On February 9, 2015, SCE filed in the OII proceeding a Late-Filed Notice of *Ex Parte* Communication regarding a meeting in March 2013 between an SCE senior executive and the president of the CPUC, both of whom have since retired from their respective positions. In response, the Alliance for Nuclear Responsibility, one of the intervenors in the OII, filed an application requesting that the CPUC institute an investigation into whether sanctions should be imposed on SCE in connection with the *ex parte* communication. The application requests that the CPUC order SCE to produce all *ex parte* communications between SCE and the CPUC or its staff since January 31, 2012 and all internal SCE unprivileged communications that discuss such *ex parte* communications.

58.     On March 13, 2015, the Company filed with the SEC its Form DEF 14A (the "2015 Proxy") in advance of the 2015 annual meeting of shareholders.  The 2015 Proxy was filed jointly by Edison and SCE.  Proposal 1 of the 2015 Proxy solicited shareholder votes on the election of defendants Bindra, Chang, Craver, Schlosberg, Stuntz, Tauscher, Taylor, and White, as well as a new nominee, Sullivan, to the boards of Edison and SCE.

59.     Proposal 3 of the 2015 Proxy solicited shareholder votes regarding an advisory vote to approve the Company's executive compensation.  The 2015 Proxy includes a description of the Company's "scoring matrix" for executive incentive compensation at both Edison and SCE, both of which matrices list "Obtained CPUC approval for fair settlement resolving outstanding issues related to the early retirement of the San Onofre Nuclear Generating Station," as "Key Factors Contributing to Actual Score."  In the case of both Edison and SCE, the financial performance score, based in part on the resolution of the SONGS OII, were the highest possible.

60.     Proposal 4 of the 2015 Proxy solicits shareholder votes on a shareholder proposal regarding the recovery of unearned management bonuses. The 2015 Proxy states that this shareholder proposal requested:

[T]he Compensation Committee of the Board of Directors to adopt an incentive compensation recoupment policy to provide that the [Compensation] Committee will (a) review, and determine whether to seek recoupment of incentive compensation paid, granted or awarded to a senior executive if, in the Committee's judgment, (i) **there has been misconduct resulting in a violation of law or company policy, that causes significant financial or reputational harm to the company and (ii) the senior executive either committed the misconduct or failed in his or her responsibility to manage or monitor conduct or risk**; and (b) disclosure to shareholders the circumstances of any recoupment, and of any Committee decision not to pursue recoupment in instances that meet criteria (i) and (ii).  The policy should mandate that the above recoupment provisions be included in all future incentive plans and awards agreements and that the policy be posted on the company website.

(Emphasis added).

61.    In support of these solicitations, the 2015 Proxy discloses:

Our Corporate Governance Guidelines provide that one of the Board's primary functions is to review the Company's enterprise risk management process and monitor strategic and emerging risks. The Board annually reviews key enterprise risks identified by management, such as financial, reputational, safety, physical and cyber security, and compliance risks, and monitors key risks through reports and discussions regarding key risk areas at Board meetings. The Board also focuses on specific strategic and emerging risks in periodic strategy reviews. The Board annually reviews corporate goals and approves capital budgets.

Board committees have responsibility for risk oversight in specific areas as follows:

The Audit Committee is responsible for oversight of (i) risk assessment and risk management policies, (ii) major financial risk exposures, and (iii) the steps management has taken to monitor and control these exposures. In carrying out these responsibilities, the Committee semi-annually reviews the Company's risk management processes and key enterprise risks, reviews the EIX risk management committee charter, receives regular reports on litigation, internal audits and compliance, receives "deep dive" reports on specific risk topics at meetings, and receives semi-annual reports of the Company's political contributions. The Committee also annually reviews and approves the internal audit plan. The EIX Vice President for Risk Management regularly attends Committee meetings and reports on risk issues.

62.    The 2015 Proxy was misleading as filed because it concealed information that a reasonable investor would have found material in deciding how to vote on Proposals 1, 3 and 4.  Specifically, the 2015 Proxy failed to adequately disclose the following material information with respect to these proposals: (i) the

true nature of Board and Company knowledge of, and involvement in, the Company's nefarious *ex parte* communication practices with the CPUC; (ii) that the supposedly "fair and reasonable" SONGS OII settlement that was used as a metric to justify the highest possible awards under the Company's incentive payment program had actually been procured through the fraudulent concealment of a systematic course of *ex parte* contacts with the CPUC designed to influence the outcome of the SONGS OII proceeding; and (iii) that the Company had been issuing, and would continue to issue, awards under the Company's incentive payment program that resulted from the Company's executives engaging in, or failing to oversee, undisclosed *ex parte* communications with the CPUC in connection with the SONGS OII that threatened significant financial and reputational harm to the Company.

**CPUC Embarks Upon an Extensive Inquiry into the Company's *Ex Parte* Communications Relative to the SONGS OII Proceeding**

63.     On April 10, 2015, the California Attorney General provided the CPUC with a two-page document containing the notes from the Warsaw Meeting. The CPUC, in turn, produced the notes to the parties in the OII proceeding and other parties who had previously requested copies through the California Public Records Act. The notes came to light when they were filed in connection with litigation in federal court initiated by a non-settling party to the SONGS OII.

64.     Later that day, the Company issued a press release titled "Southern California Edison Statement on San Onofre Nuclear Plant Settlement," which read in part:

> ROSEMEAD, Calif., April 10, 2015 — Notes filed today in federal court relate to a notice Southern California Edison filed in February with the California Public Utilities Commission (CPUC) regarding a conversation with a CPUC commissioner in 2013. The notes underscore numerous differences between the conversation in 2013 and the final settlement of the San Onofre nuclear plant investigation. The notes were drafted by then SCE executive Stephen Pickett, with annotations by CPUC President Michael Peevey, who requested the meeting to get an update on efforts to restart San Onofre. As SCE explained in the CPUC notice, on March 26, 2013, Mr. Peevey initiated a communication in which he expressed his thoughts on the structure of a possible resolution of the Order Instituting Investigation (OII) for the San Onofre nuclear

plant. Mr. Peevey indicated he would consider such a resolution acceptable but would nonetheless require agreement among at least some of the parties to the Investigation.

65.     Edison continued its pattern of deficient and untimely disclosures with its April 13, 2015 filing of a supplement to the February 9, 2015 Filing.  This filing consisted of copies of the notes from the Warsaw Meeting, which the Company acknowledged were drafted by Pickett with annotations from Peevey.  Edison stated that it did not obtain a copy of the notes until April 10, 2015.

66.     On April 14, 2015, ALJ Darling and ALJ Dudney issued an Administrative Law Judges' Ruling Directing Southern California Edison Company to Provide Additional Information Related to Late-Filed Notices of Ex Parte Communications.  The ruling found that "[t]he Late-Filed *Ex Parte* Notice offered little information about the content of the meeting between Commission President Peevey and SCE's Executive Vice President" and directed SCE to provide the following additional information to the CPUC and the parties no later than April 29, 2015: (a) documents pertaining to oral and written communications about potential settlement of the SONGS OII between any SCE employee and CPUC decision makers between March 1, 2013 and November 31, 2014; and (b) internal written communications which reported, discussed, referred to, or otherwise contained a description of oral or written communications about settlement with CPUC decision makers.   The ruling further directed SCE to file notices of any undisclosed communication identified in part (a) or any other oral or written *ex parte* communication relating to the substantial issues described in the OII proceedings.

67.     On April 17, 2015, ORA issued a press release titled, "ORA Director Joe Como Response to Conduct by Southern California Edison and Former CPUC President Michael Peevey to Undermine the SONGS Settlement Process," which states in part:

SAN FRANCISCO, April 17, 2015 – The Office of Ratepayer Advocates (ORA), the independent consumer advocate within the California Public Utilities Commission (CPUC) wants at least $648

million returned to customers of Southern California Edison Company (Edison) and San Diego Gas & Electric Company (SDG&E) because of recently revealed evidence of inappropriate conversations between former CPUC President Michael Peevey and Edison Executive Vice President Stephen Pickett. These two individuals worked in secret to outline an acceptable financial settlement of the San Onofre Nuclear Generating Station (SONGS) closure. This back-channel deal between a regulator and the utility may have undermined the efforts of ORA and The Utility Reform Network (TURN) to negotiate the best deal for ratepayers.

ORA is outraged at the revelations regarding CPUC rule violations that occurred prior to the commencement of the SONGS settlement negotiations, and that Edison's actions have undermined the results of ORA's good faith negotiations to represent the best interests of ratepayers. ORA looks forward to actively participating in any investigation to uncover further wrongdoing.

On February 9, 2015, ORA first became aware of the discussion between Peevey and Pickett when Edison filed with the CPUC a 2-year late ex parte notice of the meeting that occurred in March 2013 in Warsaw, Poland. On Friday April 10, 2015, we learned that the conversation outlined a framework for a SONGS settlement and was memorialized on hotel stationery (commonly referred to as the Hotel Bristol Notes). ORA had not seen the Hotel Bristol Notes until they were publically released one week ago by the California Attorney General.

\* \* \*

The process for fair dealings at the CPUC had been severely compromised. But to simply invalidate the settlement and go back to the hearing room would essentially give Edison the opportunity to litigate for an outcome that may be worse than the settlement. Edison should not be given a second bite at the apple. But if the CPUC were to scrap the SONGS settlement, ORA is prepared to vigorously litigate for a better outcome.

Alternately ORA recommends, at a minimum, Edison be sanctioned and required to return to ratepayers an additional $648 million, which represents the difference between ORA's original litigation position and what the settlement provided. Furthermore, as more information is developed in the investigation that determines the extent to which Edison worked to mislead the CPUC by artifice or false statements, Edison should be further sanctioned.

(Emphasis in original).

68. On April 27, 2015, the Company filed with the SEC a Form 8-K that disclosed the following results from the proposals contained in the 2015 Proxy: (i) as a result of Proposal 1, all of the Individual Defendants were reelected to new terms on the Boards of Edison and SCE; (ii) as a result of Proposal 3, the Company's

executive compensation was approved; and (iii) as a result of Proposal 4, the shareholder proposal regarding the recovery of unearned management bonuses was not adopted.  The reelection of the Individual Defendants based on the misleading statements contained in the 2015 Proxy and other public filings was a fundamental link in their continued breaches of fiduciary duties because they could not have continued their deception as alleged below without reelection to Edison's Board.

69.     Also on April 27, 2015, ANR filed with the CPUC a petition seeking modification of the November 20, 2014 Decision. The petition raised two fundamental arguments: "one concerning extrinsic fraud by SCE, which severely prejudiced [ANR] (and other non-utility parties) and prevented it (and them) from effective participation in [the SONGS OII proceeding]," and the other "concerning SCE's fraud-by-concealment, which induced a legally defective settlement agreement in [the SONGS OII proceeding]."  According to ANR's petition:

> The content of the [Warsaw Meeting] Notes, and the failure of SCE to properly disclose the oral and written *ex parte* communications memorialized by the Notes, constitute what the [CPUC] has previously characterized as "new facts or circumstances which create a strong expectation that we would have made a different decision in a prior order."

70.     The petition states that had ANR been aware of the March 26, 2013 *ex parte* communications in Poland, it would have contested numerous elements of the design and execution of the SONGS investigation:

> SCE's exclusive knowledge of the oral and written communications in the collateral Peevey-Pickett meeting unfairly deprived [ANR] and other parties of the ability to fully participate in [the SONGS proceeding].

> * * *

> Speaking only for itself, had [ANR] received timely notice of Mr. Pickett's March 26, 2013 oral and written *ex parte* communications to Mr. Peevey, including a copy of the Notes, it would have:

> * * *

> - attended the March 27, 2014 "settlement conference" required by Rule 12.1(b) and pointed out that, in negotiating with the Office of Ratepayer Advocates

("ORA") and The Utility Reform Network ("TURN"), SCE had managed to improve its position by $1.419 – 1.438 billion from the position attributed to Mr. Peevey in the Notes;

- documented in its May 7, 2014 Opening Comments Opposing the Proposed Joint Settlement Agreement (and reiterated in its May 22, 2014 Reply Comments) that, in negotiating with ORA and TURN, SCE had managed to improve its position by $1.419 – 1.438 billion from the position attributed to Mr. Peevey in the Notes;

- cross-examined the witnesses from SCE, ORA, and TURN at the May 14, 2014 evidentiary hearing on how their claim that the Proposed Joint Settlement Agreement reflected "a hard fought process over many months" could be reconciled with a result $1.419 – 1.438 billion inferior to that articulated by Mr. Peevey in the Notes;

- identified in its September 15, 2014 Comments on the Assigned Commissioner and Administrative Law Judges' Ruling Requesting Settling Parties to Adopt Modifications to Proposed Settlement Agreement that, despite the improvements represented by the requested modifications, the result remained $1.239 – 1.309 billion inferior to the position articulated by Mr. Peevey in the Notes[; and]

- argued in its October 29, 2014 Opening Comments on the Proposed Decision approving the Amended and Restated Settlement Agreement (and reiterated in its November 3, 2014 Reply Comments) as well as in its October 31, 2014 oral argument to the full Commission that – notwithstanding the "hard-fought process" and the requested modifications to correct "provisions which unfairly disfavor ratepayers" – the Commission was being asked to approve an outcome $1.239 –1.309 billion worse for ratepayers than the position articulated by Mr. Peevey in the Notes.

71. The petition also attaches a declaration by ANR's counsel that states:

My April 13, 2015, conclusion was that SCE (and by its SONGS co-ownership, SDG&E) managed to improve its position by at least $919 million, and arguably $1.522 billion, from the position attributed to Mr. Peevey in the Notes. I have subsequently reviewed an ORA press release dated April 17, 2015, included as Attachment 3 to this Declaration, and a TURN press release dated April 17, 2015. Both press releases electronically link to the same comparison document, which I have carefully examined and include as Attachment 2 to this Declaration. Based on the information in the ORA/TURN document and my further reflection, I have revised my estimate of SCE's improved

bargaining position in negotiating the March 27, 2014 settlement proposal to a range of $1.419 billion and $1.438 billion.

72.    On April 28, 2015, Edison filed with the SEC its Form 10-Q for the first quarter of 2015 (the "First Quarter 2015 10-Q").   In the quarter, the Company reported net income of $327 million, or $0.91 per diluted share, on revenue of $2.51 billion, compared to a net income of $202 million, or $0.54 per diluted share, on revenue of $2.93 billion for the same period in the prior year.   The First Quarter 2015 10-Q contains a signed certification pursuant to SOX by defendant Craver stating that the financial information contained in the First Quarter 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.   The First Quarter 2015 10-Q also discloses:

**San Onofre Proceedings, Recoveries, and Decommissioning**

As discussed in the 2014 Form 10-K, in November 2014, the CPUC approved the San Onofre OII Settlement Agreement that SCE had entered into with TURN, the ORA, SDG&E, the Coalition of California Utility Employees, and Friends of the Earth. The San Onofre OII Settlement Agreement resolved the CPUC's OII and related proceedings regarding the Steam Generator Replacement Project at San Onofre and the related outage and subsequent shutdown of San Onofre. The San Onofre OII Settlement Agreement does not affect proceedings related to recoveries from third parties described below, but does describe how shareholders and customers will share any potential recoveries.

A federal lawsuit challenging the CPUC's authority to permit rate recovery of San Onofre costs and an application to the CPUC for rehearing of its decision approving the San Onofre OII Settlement Agreement were filed in November and December 2014, respectively. On April 16, 2015, a ruling was issued dismissing the federal lawsuit with prejudice.

In February 2015, SCE filed in the OII proceeding a Late-Filed Notice of *Ex Parte* Communication regarding a meeting in March 2013 between an SCE senior executive and the president of the CPUC, both of whom have since retired from their respective positions. In response, the Alliance for Nuclear Responsibility, one of the intervenors in the OII, filed an application requesting that the CPUC institute an investigation into whether sanctions should be imposed on SCE in connection with the *ex parte* communication. The application requests that the CPUC order SCE to produce all *ex parte* communications between SCE and the CPUC or its staff since January 31, 2012 and all internal SCE unprivileged communications that discuss such *ex parte* communications.

On April 14, 2015, the OII ALJs ordered SCE to produce unprivileged documents pertaining to oral and written communications regarding the possible settlement of the OII proceeding between any SCE employee and CPUC decision makers. SCE's response is due on April 29, 2015.

On April 17, 2015, ORA and TURN issued press releases asking the CPUC to impose penalties on SCE in connection with the *ex parte* communication. ORA recommended penalties in the amount of $648 million, representing ORA's calculation of the difference in ratepayer value between ORA's initial negotiating position in the SONGS OII and the approved settlement. TURN did not recommend a penalty amount. Neither party asked the CPUC to reopen the settlement. TURN stated that, based on SCE's response to the OII ALJs' April 14, 2015 order, it may seek a reopening of the OII proceeding. On April 27, 2015, the Alliance for Nuclear Responsibility filed a petition to modify the CPUC's decision approving the San Onofre OII Settlement Agreement due to the *ex parte* communication. The petition seeks the reversal of the decision approving the San Onofre OII Settlement Agreement and reinstatement of the OII proceeding.

SCE cannot predict the outcome of these proceedings.

**In Response to the CPUC's Directives, the Company Produces Hundreds of Pages of Previously Undisclosed *Ex Parte* Communications**

73.    On April 29, 2015, in response to ALJ Darling and ALJ Dudney's April 14, 2015 ruling, the Company filed a production that included hundreds of pages of previously undisclosed *ex parte* communications (the "April 29, 2015 Filing").

74.    In a declaration from Pickett that was included with the April 29, 2015 Filing (the "Pickett Declaration"), Edison revealed that as early as April 1, 2013, Pickett had briefed senior Edison executives about the Warsaw Meeting.  Those senior executives included Craver, then-SCE President Ron Litzinger ("Litzinger"), Edison Chief Financial Officer Jim Scilacci, and then-Edison General Counsel Robert Adler.  After the briefing session, Pickett sent the senior executives an e-mail attaching a typed document authored by Pickett that summarized the Warsaw Meeting.  Pickett titled that document, rather tellingly, "Elements of a SONGS Deal."  The Pickett Declaration stated that "Elements of a SONGS Deal" was "intended to be an internal outline that could serve as a basis for discussing a potential settlement in a deal with consumer and other groups should SCE's efforts to restart SONGS prove unsuccessful."  The Pickett Declaration thus makes clear

that knowledge of the Warsaw Meeting reached the highest levels of the Company's management as early as April 1, 2013.

75.     The April 29, 2015 Filing further disclosed that on June 6, 2013, Craver sent Bindra, Schlosberg, Taylor, and White an e-mail describing two improper substantive *ex parte* contacts with former-CPUC President Peevey.   The e-mail specifically describes two conversations between Craver and Peevey referencing the SONGS OII and coordinating public statements and lobbying efforts with the Governor of California.   The e-mail states, in pertinent part:

> Wanted to give you a quick report on my phone calls with Governor Brown, Senator Feinstein and Mike Peevey.
>
> * * *
>
> President Peevey—actually two calls, as the first one was interrupted by the Governor's call.  Constructive, positive.  Glad to get this uncertainty over with and focused on their ratemaking OII.  Said he was going out with a statement after our investor call; his statement will focus on "urging the parties to meet and see if they could come up with a settlement to submit to the CPUC" and that he was going to convene a task force of sorts including the two utilities and various state agencies to work on insuring reliability.  We talked about my call with the Governor, and I asked him to see if he could get the Governor to say something supportive about our handling of the situation and look forward.

76.     Accordingly, a majority of the Board had actual knowledge that high-ranking Edison personnel had repeatedly participated in improper *ex parte* communications with Peevey regarding the SONGS OII as early as June 6, 2013 and failed to disclose those communications as required by the applicable CPUC rules and the OII.

77.     Furthermore, the April 29, 2015 Filing also disclosed numerous *ex parte* communications between the Company and the CPUC regarding the Greenhouse Gas Initiative.  According to a declaration from Litzinger included with the April 29, 2015 Filing (the "Litzinger Declaration"), Litzinger attended a meeting with then-CPUC President Peevey and CPUC Commissioner Florio on May 2, 2014 wherein:

> Peevey stated he was pleased with the SONGS settlement.   President Peevey stated that I probably knew he had talked to Mr. Pickett in

Poland.  President Peevey waved a set of handwritten notes, but did not give me the notes to read . . . President Peevey told me that the settlement was missing a provision to address the greenhouse gas impacts of the SONGS retirement, and he asked SCE to make a voluntary contribution to the University of California ("UC"), specifically UCLA, for greenhouse gas research.  President Peevey stated the contribution should total $25 million over five years, with $4 million a year coming from SCE and $1 million a year coming from SDG&E.

78.     The Litzinger Declaration reveals several other interactions between the Company and the CPUC relating to the Greenhouse Gas Initiative that took place throughout the duration of the SONGS OII negotiations.

79.     The April 29, 2015 Filing sent the parties to the SONGS OII into an uproar that included: (i) a motion from ORA seeking an interim ban on communications between SCE and the CPUC; (ii) an amended motion from ANR for sanctions; and (iii) a petition from ANR for modification of the settlement based upon the information contained in the April 29, 2015 Filing.

80.     On June 24, 2015, TURN filed a response to the ANR's petition for modification of the settlement. TURN's response states, in part:

> TURN . . . *believes that the Commission should reopen the SONGS investigation* to address the public perception that the outcome was a product of intervention by former President Michael Peevey and decide the allocation of costs related to the shutdown facility through litigation rather than via settlement.
>
> * * *
>
> A4NR asserts that the failure of SCE to disclose its extensive communications with former President Peevey represents fraud by concealment that unfairly disadvantaged TURN and the Office of Ratepayer Advocates in the settlement negotiations. A4NR argues that, had SCE filed *ex parte* notices disclosing these communications, "both ORA and TURN would likely have negotiated a better settlement." As a remedy, A4NR proposes that the Commission set aside approval of the amended settlement agreement, revive the Phase 1 Proposed Decision, and prepare a Proposed Decision in Phase 2 based on the previously submitted briefs. A4NR further proposes that parties be directed to submit written recommendations for "how best to conclude I.12-10-013".
>
> TURN     agrees     that     recent     disclosures     detailing     extensive communications between SCE and CPUC decisionmakers during the pendency of this proceeding are very troubling. TURN was a good faith participant in the settlement negotiations, and was not aware of the

Warsaw note, the private meeting, or any agreement between Mr. Peevey and SCE at any time before or during the extended settlement negotiations that led to the proposed settlement. Had SCE disclosed these communications in a timely manner, this information would have had an impact on settlement negotiations although it is not clear whether the outcome for ratepayers would have been materially different.

\* \* \*

[ ]TURN is concerned that recent revelations of extensive private conversations and dealmaking between SCE and Mr. Peevey create the public perception that the settlement process was fundamentally and irreparably tainted and drove outcomes that are unfair to ratepayers. Moreover, ongoing federal and state investigations that caused the disclosure of the Warsaw note may lead to criminal indictments. In light of these extraordinary circumstances, the Commission must take steps to restore public confidence in the legitimacy of its process relating to SONGS. The most direct way to restore public confidence on these matters is to reopen the proceeding and determine the allocation of SONGS-related costs without any possible involvement by Mr. Peevey and based exclusively on testimony, evidentiary hearings and briefs.

(Emphasis added).

81.     On June 26, 2015, ALJ Darling issued an E-mail Ruling Requesting Supplemental Information From Southern California Edison By July 3, 2015. The ruling directed SCE to produce additional information related to a number of previously undisclosed *ex parte* communications between January 2013 and June 2014, as well as certain items identified on its privilege logs.

82.     On July 3, 2015, Edison responded to ALJ Darling's June 26, 2015 Ruling, and in connection with the response filed forty-three (43) additional documents.

83.     During the week of July 6, 2015, numerous media publications reported that the California Attorney General had issued and executed two search warrants, at least one of which involved a search of Edison headquarters.  The search warrants addressed to the Company generally sought:

Any and all records from January 2012 until current, involving the [SONGS] closure settlement agreement, the 2013 meeting between Stephen PICKETT and Michael PEEVEY in Poland, communication(s) pertaining to the determination of when and why SONGS would be closed, commitment of monies for research as a result of the closure of SONGS, and communication(s) pertaining to the settlement of the SONGS [OII].

**ALJ Darling Finds the Company Committed Ten (10) *Ex Parte* Communication Violations and Orders the Company to Show Cause as to Why It Should Not Be Held in Contempt**

84.     On August 5, 2015, ALJ Darling issued an Amended Administrative Law Judge's Ruling Finding Violations of Rule 8.4, Requiring Reporting of Ex Parte Communications, and Ordering Southern California Edison Company to Show Cause Why It Should Not Also Be Found in Violation of Rule 1.1 and Be Subject to Sanctions for All Rule Violations (the "August 5, 2015 Ruling").

85.     The August 5, 2015 Ruling made clear that "[t]he primary catalyst for review of [SCE's] alleged unreported communications was SCE's very late-filed, post-decision disclosure of one or more meetings between former Commission President Michael Peevey and SCE's then- Executive Vice President of External Relations, Stephen Pickett, on or about March 26, 2013."

86.     The August 5, 2015 Ruling provided a detailed list of ten (10) *ex parte* communications that occurred and were not timely reported.  The August 5, 2015 provided the following findings regarding each violation:

      a)    3/26/13 - Poland meeting: Pickett's statements that Peevey did all the talking about the possibility of settlement of the SONGS OII in a "one-way" meeting are not credible in light of other evidence. In particular, Pickett admits he disagreed with Peevey over treatment of replacement power costs and thus, engaged in a substantive communication with a decisionmaker which was not reported until nearly two years later, after a decision had been adopted.

      b)    3/27/13 - Pickett admitted he continued communication with Peevey the following night during dinner with others and wrote an internal e-mail that he was "working" SONGS at the dinner. Pickett also admitted discussing possible settlement partners with Peevey. Pickett's later statement that he did not recall discussing SONGS is less reliable than his contemporaneous internal e-mail. Pickett's credibility is adversely impacted by his failure to disclose the true nature of the March 26, 2013 meeting. Thus, the evidence weighed in favor of concluding that Pickett communicated with Peevey on substantive issues relating to the potential allocation of some costs to be determined in the proceeding.

c)   5/28/13 - [Company Senior Vice President of Regulatory Policy and Affairs Les] Starck sent an e-mail to all five [CPUC] Commissioners with an SCE press release that provided SCE's response to U.S. Senator Boxer's allegations, made in reliance on two letters from SCE to [Mitsubishi Heavy Industries, the generators' manufacturer] from 2004 and 2005, that the NRC and SCE made errors related to the design of the [replacement steam generators]. Although Phase 3 had not yet begun, the Preliminary Scope in the initial OII and the Phase 1 scoping memo clearly indicated that the prudency of SCE's actions related to the [replacement steam generator] design were likely to be a factor in determining whether the SGRP costs, including for post-shutdown repairs, were reasonable. The press release includes substantive and argumentative content about SCE's actions and constituted a substantive communication to be determined in the SONGS OII.

d)   5/29/13 – [Company Senior Director of State Energy Regulation Michael] Hoover's communication with Peevey's Chief of Staff, Carol Brown: In connection with SCE's e-mail of the press release, Hoover talked to Brown and reported to Starck that she told him Pickett was "well prepared in Poland with specifics," but complained that "nothing has happened." It is not credible that this is a non-substantive "one-way" discussion. The press release which prompted the communication was substantive, the topic upon which Pickett was "well-prepared" was much more likely to be possible settlement terms because the status report on the restart request was mostly limited to NRC's regulatory process, i.e., not "specifics" or something that SCE could make "happen."

e)   6/26/13 - Litzinger gave [Commissioner] Florio a "brief" update on the status of bargaining efforts regarding employee severance after announcement of the permanent shutdown of SONGS.  The question of SCE's employee compensation commitments and cost recovery of employee severance costs were substantive topics because their reasonableness would be considered by the Commission when reviewing 2013 SONGS Operations and Maintenance expenses.

f)   9/6/13 - Lunch meeting with Peevey, Litzinger and "the Chino Hills team" during which they discussed, inter alia, delaying any decision on SCE's 2012 ERRA proceeding regarding replacement power costs until a settlement was adopted in the SONGS OII. Starck's internal e-mail to Pickett states that Litzinger offered his view in opposition to Peevey's approach by which SCE would get either replacement power costs or its capital investment but not both. Litzinger and Peevey engaged in a substantive discussion of possible outcomes of SCE's cost recovery claims for replacement power and capital investment at

SONGS. Notably, at least one person at SCE advised Starck to check with Hoover about whether to report the "potential ex parte communication," to which Hoover replied that Starck "should not put this in his notes." These latter e-mails also suggest that some SCE personnel were not committed to full disclosure of ex parte communications.

g)   11/15/13 - Craver had a dinner meeting with Peevey where he discussed efforts to bring [Mitsubishi Heavy Industries] to the negotiating table regarding SCE's warranty claim, and efforts to gain written support from federal officials. Some aspects of SCE's litigation of its claims against [Mitsubishi Heavy Industries] is within the Preliminary Scope of "ratemaking issues related to warranty coverage…of SONGS costs.["] The diligence of SCE's actions to pursue alternate sources of funds to cover shutdown-related costs were relevant to the reasonableness of its actions after shutdown and funds recovered from [Mitsubishi Heavy Industries] would be considered by the Commission to offset cost allocations to ratepayers in a later phase. Therefore, the communication was substantive because it concerned matters to be determined in the OII and of interest to other parties.

h)   5/28/14 - Hoover met with Peevey who said he "talked to you and Ron about [the Greenhouse Gas Initiative] and was not pleased that SCE was hesitant to contribute funds to the Center for Sustainable Communities at UCLA as part of the SONGS settlement." Peevey asked Hoover to tell SCE he would hate to see the tight schedule for the settlement slip, but no evidence that Hoover responded substantively. SCE's disclosures and the e-mail support that an unreported communication occurred between Litzinger and Peevey in which the substantive issue of a possible settlement provision to address [greenhouse gas] impacts was discussed. However, the evidence does not support that the communication between Hoover and Peevey was substantive.

i)   6/11/14 - Peevey called Hoover to his office to discuss the [greenhouse gas] issue, asked Hoover to deliver his letter to Litzinger which had several letters attached. The letters were written to the Commission by several public officials urging the Commission to support [greenhouse gas] research. Hoover transmitted the materials to Litzinger. The evidence is that "Peevey talked with Ron last week" and then lowered the requested annual research amount to $3 million. It is more credible that such a discussion was two-way because a significant change occurred in the parameters of a disputed issue related to the settlement of the OII. The public officials' letters may also have been unreported *ex parte* communications but are not at issue as to SCE.

---

j)    6/17/14 - Peevey met with Craver about the [greenhouse gas] issue but Craver states he responded that he could not engage with Peevey on that topic. Although characterized by SCE as "one-way," the evidence indicates that it was more likely two-way and substantive. The e-mail states, "Ted just came and got Peevey" and the meeting was "about UCLA." This is a substantive topic to be determined in the OII and other parties might seek to contest the issue.

87.   The August 5, 2015 Ruling also found that SCE, through Pickett and Litzinger, potentially violated Rule 1.1 which prohibits parties to a CPUC proceeding from making false statements or otherwise misleading the Commission. In rendering its findings as to the Company's potential Rule 1.1 violations, the August 5, 2015 Ruling found that Edison and Pickett improperly misled the CPUC by mischaracterizing Pickett's *ex parte* communications with Peevey in Warsaw, Poland as non-substantive interactions.  In addition, the August 5, 2015 Ruling found that Edison and Litzinger made potentially misleading statements to the CPUC regarding the scope and frequency of Litzinger's *ex parte* communications.

88.   The August 5, 2015 Ruling ordered Edison to file retroactive disclosure notices regarding *ex parte* commnications between Edison and the CPUC from March 26, 2013 through June 17, 2014 and ordered Edison to show cause as to why: (i) the Company should not be held in contempt of the Commission and sanctioned for ten (10) violations of Rule 8.4; (ii) the Company should not be found to have violated Rule 1.1 on one or more occasions; and (iii) if Rule 1.1. violations are established, why the Company should not be held in contempt of the Commission and sanctioned.

89.   On August 11, 2015, ORA filed a petition requesting the CPUC to "overturn its decision adopting the [SONGS] settlement and reopen the SONGS investigation to all for resolution through litigation rather than through settlement." ORA's petition states, in pertinent part, that:

ORA was extraordinarily troubled by the revelations of ex parte communication violations and, in fact, filed its own motion to bar any future ex parte communications by any parties for any purpose in the

proceeding. ORA believed then, as it does now, that the appropriate way to address the massive and pervasive violations is to extract sufficient financial concessions (not limited to penalties that would inure to the State of California) that would remove any conceivable benefit Edison might have achieved as a result of the unlawful communications. ORA believes that the additional appropriate amount that should flow from Edison to ratepayers should be at least $648 million, the difference between the settlement amount and ORA's initial litigation position prior to the state of settlement negotiations.

ORA therefore determined that it would not join the effort to reject the settlement, but rather reluctantly honor its commitment to support the settlement. However, circumstances have since changed and ORA now takes the position that ratepayers and the public generally are better served by allowing ORA, TURN, A4NR and other consumer groups to work towards a litigated outcome for all issues in the SONGS investigation docket. Based on the August 5, 2014 ALJ Amended Ruling, it does not appear possible that ORA can achieve the amount of reimbursement it believes would compensate ratepayers for Edison's unlawful activities that undermined the SONGS settlement negotiations.

(Footnotes omitted).

90.    On October 20, 2015, SCE filed a supplement to its April 29, 2015 Filing (the "Supplement") that revealed further undisclosed *ex parte* communications between the Company and the CPUC. Specifically, the Supplement contained sixteen (16) e-mails and four pages of handwritten notes relating to SCE executive Russ Worden's communications with ALJ Darling from a time period spanning from April 20, 2014 to July 10, 2014. Notably, these communications took place prior to ALJ Darling's endorsement of the SONGS OII settlement on November 20, 2014.

91.    The Supplement contains an e-mail dated June 11, 2014 from Worden to other SCE representatives that recounts a phone call between Worden and ALJ Darling from the previous day. The e-mail states, in pertinent part: "Yesterday, Judge Darling called me to discuss plans for the SONGS meeting on Monday in Costa Mesa. She went out of her way to compliment SCE on our outreach and media publicity to notify outlets about the meeting. She said, "I like your plan of action. She especially notes the 'in language' publicity. I thought you should know how much the Commission appreciate it [sic]." The "meeting on Monday in Costa Mesa" is likely a reference to a community information meeting on the proposed

SONGS settlement agreement that was held on Monday, June 16, 2014 at the Costa Mesa Neighborhood Community Center in Costa Mesa, California.

92.    The Supplement also recounts a phone call between Worden and ALJ Darling from July 10, 2014.  According to Worden's handwritten and typed notes from that call, ALJ Darling asked Worden if SCE thought the record in the OII proceeding needed to be reopened, to which Worden replied "Emphatically, no." Following the call, Megan Scott-Kakures, Vice President of Regulatory Operations at SCE, sent an e-mail to Worden asking "Anything important from Darling?"  In a reply e-mail, Worden answered "Good call, and one great story."

**ALJ Darling Issues Proposed Decision Affirming the Company's Violations of Rule 8.4 and Rule 1.1 and Imposes $16.74 Million Sanction on the Company**

93.    On October 27, 2015, ALJ Darling issued a revised Decision Affirming Violations of Rule 8.4 and Rule 1.1 and Imposing Sanctions on Southern California Edison Company (the "October 27, 2015 Ruling").  The October 27, 2015 Ruling is attached hereto as Exhibit A.   The October 27, 2015 Ruling was prepared as a proposed decision for final consideration by the entire CPUC. *See* Ex. A. at 8.

94.    The October 27, 2015 Ruling held:

> This decision affirms eight violations of Rule 8.4 of the Commission's Rules of Practice and Procedure (Rule) by Southern California Edison (SCE) stemming from failure to report, before or after, ex parte communications which occurred between an SCE executive(s) and a Commissioner.  In addition, this decision finds that SCE twice violated Rule 1.1., the Commission's Ethics Rule, as a result of the acts and omission of SCE and its employees which misled the Commission, showed disrespect for the Commission's Rules, and undermined public confidence in the agency.

*Id.* at 2.

95.    The October 27, 2015 Ruling further held: "Due to these rule violations, the decision imposes a total financial penalty on SCE of $16,740,000.  This decision affirms, in part, the [August 5, 2015 Ruling] which initially found ten violations of Rule 8.4 of the Commission's Rules by SCE." *Id.*   The two communications that were found to have not violated Rule 8.4 are: (i) the May 29, 2013 communication

1    between Hoover and Brown (discussed in ¶ 86(d), above); and (ii) the June 17, 2014

2    communication between Peevey and Craver (discussed in ¶ 86(j), above).  *See id.* at

3    12.

4         96.    The October 27, 2015 Ruling broke down the $16,740,000 penalty as

5    follows:

6         > The single biggest penalty of $16,520,000 is based on finding that a
7         > continuing Rule 1.1 violation was set in motion by Mr. Pickett's grossly
          > negligent failure to accurately and timely report his ex parte
8         > communications in Warsaw, Poland with former President Peevey.
          > This conduct triggered other misleading acts and omissions by SCE
9         > from the date it should have filed notice of the March 26, 2013
          > meeting through July 6, 2015, the last date in which SCE repeated Mr.
10        > Pickett's misleading statements. . . . [T]he decision also imposes
          > $190,000 in fines on SCE for the violations of Rule 8.4 related to
11        > unreported ex parte communications, and $30,000 for the other Rule 1.1
          > violation related to Mr. Litzinger's false statement about ex parte
12        > communications.

13   *Id.* at 2-3 (footnote omitted). Indeed, the Court noted that the "late and inaccurate

14   Late Notice regarding the March 26, 2013 Poland meeting [was] the most egregious

     violation." *Id.* at 46.

15        97.    The October 27, 2015 Ruling chastised the Company in connection with

16   the finding of Pickett's Rule 1.1 violation.  Specifically, the October 27, 2015 Ruling

17   noted:

18        > [T]he violation of Rule 1.1. is not grounded in a mere difference in
19        > recollection. Instead, it is an aggregate of choices made by SCE and its
          > employee, Mr. Pickett, which illustrate a pattern of lax oversight and
20        > grossly negligent disregard for the Commission's Rules.  The net effect
          > is a series of acts and omissions favoring non-disclosure over disclosure
21        > of one-on-one communications with decisionmakers.

22                                   * * *

23        > In sum, the Commission finds, based on the evidence, and all reasonable
          > inferences to be drawn therefrom, that SCE violated Rule 1.1. SCE's
24        > employee made false and misleading statements which masked his
          > provision of opinions and comments to a Commissioner about a
25        > possible framework for settlement of the SONGS OII that would
          > otherwise have triggered a duty by SCE to file a notice of the ex parte
26        > communication.   Thereafter, SCE and Mr. Pickett continued making
          > false and misleading statements in the Late Notice and in response to
27        > ALJ requests for information.  If undiscovered, their actions would have
          > left the Commission with the false impression that SCE did not have an

28

early discussion with former President Peevey about cost recovery through settlement.

*Id.* at 29-30.

98.    In evaluating the appropriate penalty to levy in response to the Company's violations, the October 27, 2015 Ruling touched upon the impact of the Company's nefarious *ex parte* communication practices on the fairness and transparency of the SONGS OII:

> SCE's violations, particularly not reporting the Poland meeting, meant that other parties lacked the knowledge, however logical, that former Presidetn Peevey and some at SCE had begun to consider permanent shutdown and what costs might be covered by a settlement. Additionally, all parties other than SCE were in the dark about former President Peevey's repeated attempts to obtain SCE's support (inside or outside the settlement) for a variously described data center or [greenhouse gas] research program at UCLA. Notably, there was little comment from parties about the competitive final [greenhouse gas] research, development, and deployment program included in the amended settlement agreement.

*Id.* at 37.

99.    While the October 27, 2015 Ruling did "acknowledge SCE's eventual disclosures and its initiative in adopting new policies to promote compliance with the Commission's ex parte rules," *id.* at 40, it nonetheless questioned the practical effect of the Company's efforts in noting that:

> [I]t is not clear whether SCE intends to rely on the role of SCE's Legal Department in determining whether the ex parte rules apply to achieve a permanent privilege claim applied to all such records, thus blocking oversight and investigative access by the Commission. Thus, SCE's proposal is of unknown benefit or accessibility.

*Id.*

100.    Further, the October 27, 2015 Ruling admonished a Company practice that:

> [P]ermitted, if not encouraged, its executives to meet with Commissioners at non-business settings where they engaged in conversations that briefly touched in a substantive issue, but did not report them on grounds they were too brief or not substantive "enough."

*Id.* at 52.

101.   In light of the Company's improper practices and procedures governing *ex parte* communications with the CPUC, the October 27, 2015 Ruling ordered "SCE to immediately develop a public website tracking of all non-public individual communications which occur after this decision is adopted related to the SONGS OII by SCE representatives with Commissioners, and/or their advisors, and/or CPUC decisionmakers . . . ." *Id.* at 3.

102.   Notably, the October 27, 2015 Ruling did not address "the impact of the violations . . . on the settlement negotiations or the final decision adopted in the SONGS proceedings because these issues are part of pending Petitions for Modification." *Id.* at 37.   Consequently, the SONGS OII settlement remains in jeopardy, and Edison could be required to pay additional hundreds of millions of dollars as part of the proceeding.

## DAMAGES

103.   Edison has been, and will continue to be, severely damaged and injured as a direct and proximate result of defendants' misconduct.  Such harm includes, but is not limited to:

a.   enormous legal costs incurred due to the late-filed *ex parte* notices and, regardless of outcome of the outcome at the SONGS OII level, now-assured years of appeals and litigation arising out of same;

b.   potential criminal and/or civil liability arising out of the California Attorney General's investigation;

c.   potentially hundreds of millions of dollars of increased liability under the SONGS OII;

d.   costs related to complying with search warrants and CPUC orders to produce hundreds of documents, many of which are years old;

e.   costs already incurred and to be incurred defending against the pending securities class actions;

1    f.    costs already incurred defending government investigations,

2    subpoenas, and suits;

3    g.    any fines that are a result of the Company's violations federal and

4    state law; and

5    h.    incentive compensation paid to executives based on the

6    fraudulently procured SONGS settlement.

7    104.   In addition, Edison's business, goodwill, and reputation with its business

8    partners, regulators, and shareholders have been gravely impaired.  The Company

9    has still not fully admitted the nature of its false statements and the true condition of

10   its business.  The credibility and motives of management are now in serious doubt.

11   105.   The actions complained of herein have irreparably damaged Edison's

12   corporate image and goodwill.  For at least the foreseeable future, Edison will suffer

13   from what is known as the "liar's discount," a term applied to the stocks of

14   companies who have been implicated in illegal behavior and have misled the

15   investing public, such that Edison's ability to raise equity capital or debt on

16   favorable terms in the future is now impaired.

17   **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

18   106.   Plaintiffs bring this action derivatively in the right and for the benefit of

19   Edison to redress the breaches of fiduciary duty and other violations of law by the

20   Individual Defendants, as alleged herein.  Plaintiffs will adequately and fairly

21   represent the interests of Edison in enforcing and prosecuting Edison's rights and

22   Plaintiffs have retained counsel experienced in prosecuting this type of action.

23   107.   Plaintiffs have continuously been shareholders of Edison at all times

24   relevant to the wrongdoing complained of and are Edison shareholders.  Edison's

25   Board consists of the following eight (8) Individual Defendants: Craver, Bindra,

26   Chang, Schlosberg, Stuntz, Tauscher, Taylor, and White, as well as non-defendant

27   director Sullivan.  When Plaintiffs commenced their respective actions the

28   composition of the Board was the same.  Plaintiffs have not made any demand on the

Board to institute this action because such a demand would be a futile, wasteful, and useless act, for the following reasons:

**Defendant Craver**

108.   Defendant Craver was well aware of the Company's improper *ex parte* communications, as well as the fact that the communications had not been disclosed as required by CPUC rules.  According to documents produced in the SONGS OII proceeding, Craver was a participant in improper and undisclosed *ex parte* communications that were fraudulently concealed in June and November of 2013. Furthermore, as early as April 1, 2013, Craver had actual knowledge of the *ex parte* Warsaw Meeting when Pickett briefed Craver on said meeting and e-mailed Craver the document titled "Elements of a SONGS Deal."   Accordingly, Craver is substantially likely to be held liable for breaching his fiduciary duties to Edison.

109.   Further, Defendant Carver is primarily employed as the President and CEO of Edison.  In his role as CEO, defendant Carver earns nearly $15 million per year.  His professional reputation and access to continued compensation from Edison are completely reliant on the goodwill of his fellow directors who have the ability to replace him as CEO.  As a result, he is unable to disinterestedly and independently consider a demand for action against his fellow directors.  Demand as to defendant Carver is excused for this reason as well.

**Defendant Taylor**

110.   Defendant Taylor is an alumnus of the University of California, Los Angeles ("UCLA") and served as the Chief Financial Officer of the University of California system until 2014.  He currently serves as the Chair Emeritus of the UCLA Foundation which is responsible for receiving contributions made to UCLA by alumni, friends, private foundations, and corporations, such as Edison, disbursing contributions, and overseeing donated resources.  Defendant Taylor previously served as President of the UCLA Foundation and is described by a UCLA press release as having "strong family ties to UCLA," where he, his sister, and his parents

received degrees.  Defendant Taylor's first cousin, Ralph J. Bunche Sr., was a UCLA alumnus and a Nobel Peace Prize recipient in 1950 in honor of whom UCLA renamed its Social Sciences Building in 1968.  Defendant Taylor also previously served as a member of the University of California Board of Regents and is a past president of the UCLA Alumni Association Board of Directors and of the Campaign Cabinet for Campaign UCLA.

111.  As a result of these significant ties to UCLA, defendant Taylor would not have been able to disinterestedly and independently consider a shareholder demand for action in connection with the wrongdoing alleged herein.  Such action would have required, among other things, a review of the propriety of the terms of the SONGS OII settlement, including Edison's agreement to contribute $4 million per year to UCLA as part of the Greenhouse Gas Initiative.  Were defendant Taylor to acknowledge that the SONGS settlement was procured through illegitimate means, that wrongdoing had occurred in connection with the settlement, or that the terms of the settlement should be reopened, he would be jeopardizing Edison's sizable contributions to UCLA under the settlement agreement in the SONGS OII.  Accordingly, demand on defendant Taylor is excused because it would be futile.

**Defendants Bindra, Schlosberg, Taylor, and White**

112.  Defendants Bindra, Schlosberg, Taylor, and White also had actual knowledge of improper *ex parte* communications, as well as the fact that the communications had not been disclosed as required by the Rules.  In particular, Bindra, Schlosberg, Taylor, and White received an e-mail from Craver on June 6, 2013 describing two improper *ex parte* contacts with former-CPUC President Peevey concerning the SONGS OII.  As a result, Bindra, Schlosberg, Taylor, and White knew *ex parte* communications were occurring and that these communications were designed to influence the SONGS proceeding.  These defendants knowingly failed to ensure that the Company disclosed these communications as it was required to do.

Accordingly, Bindra, Schlosberg, Taylor, and White are substantially likely to be held liable for breaching their fiduciary duties to Edison.

**Bindra, Chang, Tauscher, and Taylor as Members of the Audit Committee**

113.    Defendants Bindra, Chang, Tauscher, and Taylor are members of the Audit Committee, and defendant Chang is the Chair of the Audit Committee. According to the Company's proxy statements, the Audit Committee met six times in each of 2013 and 2014.  According to the 2015 Proxy:

> The Audit Committee is responsible for oversight of (i) risk assessment and risk management policies, (ii) major financial risk exposures, and (iii) the steps management has taken to monitor and control these exposures. In carrying out these responsibilities, the Committee semi-annually reviews the Company's risk management processes and key enterprise risks, reviews the EIX risk management committee charter, receives regular reports on litigation, internal audits and compliance, receives "deep dive" reports on specific risk topics at meetings, and receives semi-annual reports of the Company's political contributions.

114.    According to its charter adopted in February 2013, the Audit Committee is tasked with oversight of: (i) the integrity of the Company's financial statements; (ii) "the Company's systems of disclosure and internal control regarding finance, accounting, legal compliance and ethics that management and the Board of established;" (iii) "the Company's compliance with legal and regulatory requirements;" and (iv) "the performance of the Company's Chief Ethics and Compliance Office . . . and of the Company's Ethics and Compliance function."  The charter also states that defendants Bindra, Chang, Tauscher, and Taylor, as Audit Committee members, "have the authority (without having to seek Board approval) and appropriate funding . . . to obtain advice and assistance from . . . outside legal, accounting and other advisors, and to incur ordinary administrative expenses as it deems necessary or appropriate to carry out its duties."  Its charter also vests the Audit Committee with the authority to request the Company's independent auditor, the Chief Ethics and Compliance Officer, management, or "any other internal or external advisors" to conduct "any" investigations, reviews, or studies of any matter within the scope of the Committee's duties and responsibilities, and "[i]n connection

with any such investigation, the Committee shall have unrestricted access to Company personnel and documents."

115. Additionally, pursuant to the Audit Committee charter, defendants Bindra, Chang, Tauscher, and Taylor are *required* ("the Committee shall") to review the Company's internal controls over financial reporting "including systems of disclosure." The Audit Committee is *required* ("shall review and discuss") to review the effect of regulatory initiatives on the Company's financial statements. The charter provides the Audit Committee "shall" annually review the performance of the Chief Ethics and Compliance Officer and "shall" receive a written report from that officer regarding the status of the Ethics and Compliance program, "including information about Ethics and Compliance Helpline calls and investigation trends." Moreover, defendant Chang, as Chair, "shall be notified promptly, and in no event subsequent to the final disposition of the matter, by the [Chief Ethics and Compliance Officer] of any 'significant' matters." The Audit Committee charter states the Committee "shall" conduct executive sessions with the Chief Compliance and Ethics Officer "as necessary to provide an opportunity to address any issues related to the ethics and compliance program that the Committee or the [Chief Ethics and Compliance Officer] believe are more appropriately addressed without management present." The Committee likewise "shall" meet with the Chief Ethics and Compliance Officers in executive session at least annually to discuss . . . management's support of and adherence to the ethics and compliance program." Finally, the Audit Committee "periodically shall review information provided by management and the Company's legal counsel on litigation and regulatory proceedings."

116. As a result, defendants Bindra, Chang, Tauscher, and Taylor were required to conduct inquiry and supervision into such issues as the SONGS OII proceeding and the Company's *ex parte* contacts with CPUC decisionmakers. The Audit Committee charter makes clear this function is not optional and the Committee

was unambiguously required, at all relevant times, to conduct such oversight. However, armed with knowledge of the Company's improper *ex parte* communication practices, the Audit Committee failed to cause the Company to disclose these contacts as it was required to, did not prevent the Company from entering a settlement agreement to the SONGS OII that was induced through fraud, and did not implement controls to ensure the Company complied with its legal and ethical responsibilities.

117. Under the Audit Committee charter, defendants Bindra, Chang, Tauscher, and Taylor were required to discuss regulatory initiatives, such as the SONGS investigation and proceeding, and settlement thereof. They were required to review written reports regarding the Company's Compliance and Ethics function, including any efforts to modify Edison's *ex parte* communication practices. They were required to discuss significant matters, such as the SONGS proceeding and settlement, with the Chief Compliance and Ethics Officers. Nonetheless, charged with knowledge of the Company's improper *ex parte* communication practices, as well as knowledge that the Company lacked inadequate control over such practices, defendants Bindra, Chang, Tauscher, and Taylor permitted the Company to enter into a fraudulently obtained settlement of the SONGS OII proceeding and only decided to implement a policy governing the Company's *ex parte* communications *after* the truth about Edison's practices began to emerge. The unmistakable conclusion is that these defendants knew of the Company's wrongdoing and, complicit in it, declined to halt it. As such, demand is excused as to defendants Bindra, Chang, Tauscher and Taylor because they face a substantial likelihood of liability.

**The Entire Board**

118. The entire Board was responsible for reviewing significant enterprise risks such as the SONGS OII. According to the 2015 Proxy:

1
2
3
4
5

> Our Corporate Governance Guidelines provide that one of the Board's primary functions is to review the Company's enterprise risk management process and monitor strategic and emerging risks. The Board annually reviews key enterprise risks identified by management, such as financial, reputational, safety, physical and cyber security, and compliance risks, and monitors key risks through reports and discussions regarding key risk areas at Board meetings. The Board also focuses on specific strategic and emerging risks in periodic strategy reviews. The Board annually reviews corporate goals and approves capital budgets.

6
7
8
9
10

119.   As a result, the entire Board reviewed major enterprise risks, specifically including compliance risk, through reports and discussions at Board meetings.  At all times relevant hereto, the greatest risk confronting Edison involved potential liability arising out of the SONGS shutdown and OII proceeding.  Because of the enormous size, complex nature, and billions of dollars in controversy in the

11
12
13
14
15

SONGS OII proceeding, the Board was required to, and did, review the significant compliance risks facing the Company in connection with this proceeding.  Clearly, one of the greatest compliance pitfalls arising from this proceeding related to *ex parte* communications with CPUC decisionmakers.  However, the Board, even while

16
17
18
19
20

it was reviewing these risks and aware of them, permitted the Company to operate without any formal policy governing *ex parte* contacts and legal compliance related thereto.  This was a breach of fiduciary duties committed by the eight (8) Individual Defendants on the Board as of November 2014 when the Company entered the SONGS OII settlement agreement – namely, defendants Craver, Bindra, Chang, Schlosberg, Stuntz, Tauscher, Taylor, and White.

21
22
23
24
25
26

120.   In addition, each of the Individual Defendants were at all relevant times subject to the Company's "Ethics and Compliance Code for Directors" (the "Code"), adopted December 8, 2011.  The Code states "[e]ach Director *must* adhere to the letter and the spirit of this Code, which offers guidance to Directors regarding *the content of their fiduciary duties* to the Company."  (Emphasis added).  The Code further states:

27
28

---

**2. COMPLIANCE WITH APPLICABLE LAWS**

Directors *must* conduct all their financial, business and other activities *in full compliance with applicable laws, rules and regulations.* In addition, Directors must adhere to applicable portions of the following Company policies: Records Retention and Destruction, Disclosure, Foreign Corrupt Practices Act, Insider Trading, Workplace Harassment, and other policies as may be adopted and identified to them from time to time by the CECO or Company General Counsel.

\* \* \*

**7. COMPLIANCE PROCEDURES**

If a Director becomes aware of facts that would cause a Director (including himself or herself) to be in violation of this Code, *the Director shall promptly inform the Chairman of the Board or the Lead Director, and the CECO or the General Counsel.* Following any substantiation of allegations, appropriate action will be determined by the Board or a duly authorized Board member or Committee.

**8. ENCOURAGING THE REPORTING OF ANY ILLEGAL OR UNETHICAL BEHAVIOR**

Directors should promote ethical behavior and take steps to ensure that the Company: (a) encourages employees to talk to supervisors, managers, the Ethics and Compliance department and other appropriate personnel when in doubt about the best course of action in a particular situation; (b) encourages employees to report violations of law, rules, regulations or the Company's Ethics and Compliance Code to their supervisor, the Ethics and Compliance department, or appropriate personnel; and (c) informs employees that the Company will not allow retaliation for reports made in good faith.

(Emphasis added).

121.   The Code could not be more clear that all eight (8) of the Individual Defendants were required to conduct the Company's business in compliance with applicable laws, rules, and regulations.  This meant complying with a fundamental legal reporting requirement in the SONGS OII proceeding.  However, the Individual Defendants permitted the Company, over the course of several years, to systematically exert concealed and fraudulent influence over CPUC decisionmakers. At least a majority of the Individual Defendants, White, Schlosberg, Bindra, Taylor, and Craver, and upon information and belief, the other three director defendants as well, specifically knew of improper *ex parte* communications.  Under the Code, the Individual Defendants were *required* to take action to halt the practice.  Not only did

they not halt the practice, as evidenced by the dozens of subsequently disclosed *ex parte* contacts that took place after the June 2013 e-mail from Craver to Bindra, Schlosberg, Taylor, and White, but they also did not take action to bring the Company into legal and regulatory compliance by requiring the Company to disclose these contacts.   Even though the Individual Defendants knew these contacts had occurred and were concealed, they approved the Company's entry into the settlement agreement of the SONGS OII proceeding predicated on this fraud in breach of their fiduciary duties.   As a result, demand is excused as to the entire Board because eight (8) of the nine (9) current Board members face a substantial likelihood of liability due to their breaches of fiduciary duties.

122.   As a result of the Individual Defendants' conduct, the Company is now the subject of securities class action lawsuits, at least one criminal probe by the California Attorney General, consumer lawsuits, and numerous motions in the SONGS OII proceeding seeking to reopen the settlement.   Any demand on the Edison Board is futile for this reason as well.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duties

123.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

124.   The Individual Defendants owe and owed to the Company the fiduciary duties of loyalty and good faith, pursuant to which they were required to, among other things, exercise good faith to ensure that the Company complied with applicable legal and regulatory requirements.

125.   Each of the Individual Defendants breached their fiduciary duties of loyalty and good faith by knowingly causing or allowing Edison to conceal *ex parte* communications with the CPUC and failing to disclose them as required by CPUC rules and the OII, as alleged in detail herein.

126.   As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, Edison has sustained and will continue to sustain damages, including, but not limited to, costs and expenses incurred in connection with the various civil and criminal proceedings and investigations described herein.

## COUNT II

### Abuse of Control

127.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

128.   Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Edison, for which they are legally responsible.

129.   As a direct and proximate result of the Individual Defendants' foregoing abuse of control, Edison has sustained and will continue to sustain damages, including, but not limited to, costs and expenses incurred in connection with the various civil and criminal proceedings and investigations described herein.

130.   As a direct and proximate result of Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Edison has sustained and continues to sustain damages, including, but not limited to, costs and expenses incurred in connection with the various civil and criminal proceedings and investigations described herein. As a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

## COUNT III

### Violations of § 14 of the Securities Exchange Act of 1934 (Derivatively)

131.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

132.   Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact

necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the 2015 Proxy violated §14(a) and Rule 14a-9 because it failed to disclose that: (i) incentive compensation was being paid, at least partially, on the basis of the SONGS OII settlement that was obtained through fraud and in violation of applicable regulatory and legal reporting requirements; and (ii) the Individual Defendants were not discharging their duties as described in the 2015 Proxy.

133. The 2015 Proxy was false and misleading when issued because it failed to disclose, among other things, (i) the true nature of Board and Company knowledge of, and involvement in, the Company's nefarious *ex parte* communication practices with the CPUC; (ii) that the supposedly "fair and reasonable" SONGS OII settlement that was used as a metric to justify the highest possible awards under the Company's incentive payment regime had actually been procured through the fraudulent concealment of a systematic course of *ex parte* contacts with the CPUC designed to influence the outcome of the SONGS OII; and (iii) that the Company had been issuing, and would continue to issue, awards under the Company's incentive payment regime that resulted from the Company's executives engaging in, or failing to oversee, unlawful *ex parte* communications with the CPUC in connection with the SONGS OII that threatened significant financial and reputational harm to the Company. As a result, the 2015 Proxy was materially false and misleading.

134. The misrepresentations and omissions in the 2015 Proxy were material to Company shareholders in voting on Proposals 1, 3, and 4 contained therein. The 2015 Proxy was an essential link in the accomplishment of the continuation of Individual Defendants' continued violation of their fiduciary duties in connection with the wrongdoing alleged herein.

135. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2015 Proxy.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.      Against all of the Individual Defendants in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control and violations of § 14 of the Securities Exchange Act of 1934;

B.      Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties, abuse of control and violations of § 14 of the Securities Exchange Act of 1934;

C.      Awarding to Plaintiffs the costs and disbursements of the action, including, reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

D.      Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiffs demand a trial by jury.

Dated:  November 9, 2015                    Respectfully submitted,

**GLANCY PRONGAY
   & MURRAY LLP**

By: */s/ Kara M. Wolke*
Lionel Z. Glancy
Kara M. Wolke
1925 Century Park East, Suite 2150
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email:  info@glancylaw.com

*Liaison Counsel for Plaintiffs*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**HARWOOD FEFFER LLP**
Robert I. Harwood
Matthew H. Houston
Benjamin I. Sachs-Michaels
488 Madison Avenue
New York, NY 10022
Telephone: (212) 935-7400

*Co-Lead Counsel for Plaintiffs*

**KESSLER TOPAZ
  MELTZER & CHECK, LLP**
Eric L. Zagar (250519)
Robin Winchester
Christopher M. Windover
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

-and-

Eli R. Greenstein (217945)
One Sansome Street, Suite 1850
San Francisco, CA  94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

*Co-Lead Counsel for Plaintiffs*

## EDISON INTERNATIONAL VERIFICATION

I, Shiva Y. Stein, hereby verify that I am familiar with the allegations in the Consolidated Complaint, and that I have authorized the filing of the Consolidated Complaint, and that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: 11/6/2015

_____

Shiva Y. Stein

**VERIFICATION**

I, Sally Ann Hausken, Trustee of the Sally Ann Hausken Trust and Sally Ann Hausken Trust Agreement, hereby verify that I have authorized the filing of the attached Consolidated Derivative Complaint (the "Complaint"), that I have reviewed the Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief.  I declare under penalty of perjury that the foregoing is true and correct.

DATE: November ___4___, 2015

*Sally Ann Hausken*

**Sally Ann Hausken, Trustee**
**Sally Ann Hausken Trust**

**VERIFICATION**

I, Roger E. Ekman, Trustee of the Roger E. Ekman Revocable Trust, hereby verify that I have authorized the filing of the attached Consolidated Derivative Complaint (the "Complaint"), that I have reviewed the Complaint and that the facts therein are true and correct to the best of my knowledge, information and belief.  I declare under penalty of perjury that the foregoing is true and correct.

DATE:  November 6, 2015

**Roger E. Ekman, Trustee**
**Roger E. Ekman Revocable Trust**

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO
SOUTHERN DISTRICT OF CALIFORNIA LOCAL RULES**

I, the undersigned, say:

I am a citizen of the United States and am employed in the office of a member of the Bar of this Court. I am over the age of 18 and not a party to the within action.  My business address is 1925 Century Park East, Suite 2100, Los Angeles, California  90067.

On November 9, 2015, I caused to be served the following document:

**CONSOLIDATED DERIVATIVE COMPLAINT**

By posting the document to the ECF Website of the United States District Court for the Southern District of California, for receipt electronically by the parties as listed on the attached Service List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on November 9, 2015, at Los Angeles, California.

*s/ Kara M. Wolke*
Kara M. Wolke

319087.1 EDISON

# Mailing Information for a Case 3:15-cv-01581-BEN-KSC Stein v. Craver, Jr. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Lionel Z Glancy**
  info@glancylaw.com,lboyarsky@glancylaw.com

- **Kara Michelle Wolke**
  info@glancylaw.com,kwolke@glancylaw.com

- **Eric L. Zagar**
  ezagar@ktmc.com,cwindover@ktmc.com,dtewksbury@ktmc.com,cmcginnis@ktmc.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`