UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE EDISON INTERNATIONAL DERIVATIVE LITIGATION, <br><br> ——————————————— <br><br> This Document Relates To: <br>    ALL ACTIONS. | Case No.:  15CV1581 BEN (KSC) <br> **ORDER GRANTING MOTION TO DISMISS** <br><br> [Docket No. 12] |

   This is a shareholder derivative action seeking to recover on behalf of nominal defendant Edison International brought against Edison International's Board of Directors ("the Board").  The Consolidated Derivative Complaint ("Consolidated Complaint" or "CDC") asserts claims for breach of fiduciary duty, abuse of control, and violation of § 14 of the Securities and Exchange Act based on Defendants' alleged awareness of unreported reportable ex parte communications with the California Public Utility Commission ("CPUC") concerning the settlement of the shutdown of the San Onofre Generating Station ("SONGS") and approval of a settlement that ultimately included $20 million in research funding recommended by the CPUC.  Defendants move to dismiss based on Plaintiffs' failure to sufficiently plead demand futility arguing there are no

particularized facts showing a majority of the Board even knew about any of the ex parte communications later found reportable or that there was anything improper about the settlement modification the Board approved.  Because Plaintiffs' allegations fail to create a reasonable doubt as to whether a majority of the Board faced a substantial likelihood of liability sufficient to make a demand on the Board futile, the Motion to Dismiss is **GRANTED**.  However, given this is Plaintiffs' first challenged pleading in this case, Plaintiffs are granted leave to file an amended complaint.

## BACKGROUND[1]

Edison is a partial owner of SONGS, a nuclear generating station, through its ownership of Southern California Edison ("SCE").  Following the discovery of a leak in a steam tube, SONGS was shut down in January 2012 and eventually shut down permanently.  (CDC ¶¶ 2, 28-32.)  The CPUC initiated an investigation on October 25, 2012, Order Instituting Investigation ("OII"), to address the allocation of costs of the shut down as between the utility owners and consumers. (CDC ¶¶ 3, 33-34.)

A settlement among the parties,[2] was reached on March 27, 2014.  (CDC ¶ 35.)  On April 3, 2014, the settlement was submitted to the CPUC for approval.  (CDC ¶ 36.)  On September 5, 2014, the CPUC requested the parties to the settlement adopt a modification to the settlement providing for $4 million in annual funding for five years[3] for a University of California entity to research "devices and methodologies to reduce emissions at existing

---

[1] The Court is not making findings of fact, but rather summarizing some of the most relevant allegations of the Consolidated Complaint.  Although not all allegations are noted, the Court has considered the entire pleading.

[2] The Consolidated Complaint alleges the settling parties were Edison, San Diego Gas and Electric ("SDG&E"), the Utility Reform Network ("TURN"), Office of Raterpayer Advocate ("ORA"), Coalition of California Utility Employees, and Friends of the Earth. (CDC ¶ 35.)

[3] Plaintiffs' Opposition references $25 million for the GHG Initiative, however, the Consolidated Derivative Complaint alleges the GHG Initiative, approved by the Board on November 20, 2014, was for $4 million a year for five years.  (CDC ¶ 5.)

and future California power plants tasked to replace the lost SONGS generation" ("GHG Initiative").  (CDC ¶ 37.)

The modification was adopted by all parties, and on September 24, 2014, the parties submitted an amended settlement agreement with the modification requested by the CPUC.  (CDC ¶ 38.)  On November 20, 2014, the CPUC approved the amended settlement.  (CDC ¶ 39.)

Plaintiffs allege the Board members were aware of the significance of the shutdown of SONGS, their ethical obligations regarding it, and the need to comply with CPUC rules governing ex parte communications with CPUC decisionmakers.  (CDC ¶¶ 41-45, 114-121.)  Plaintiffs also allege that on September 25, 2014 an email was sent from Edison's Chief Ethics and Compliance Officer and two other SCE executives to Company personnel stating "[w]hile we are well aware of the CPUC's ex parte communications rule, this situation makes clear that awareness is not enough." (CDC ¶ 44.)

On February 9, 2015, Edison announced that it was strengthening its policy on communications with the CPUC to exceed current CPUC requirements.  (CDC ¶¶ 45, 54; Request for Judicial Notice ("RJN"),[4] Ex. K.)  The same day, Edison filed a Late-Filed Notice of Ex Parte Communication ("February 9 Notice") in the OII proceeding disclosing a March 26, 2013 meeting that took place at an industry event in Warsaw, Poland.  (CDC ¶ 8.)  The February 9 Notice indicates the meeting included both then SCE Executive Vice President of External Relations Stephen Pickett and former CPUC President Michael Peevey and was being reported late because Pickett had revealed further information the week before that suggested the meeting may have crossed into a substantive communication.  (CDC ¶¶ 51, 53.)  Shortly before this announcement and

---

[4] The Court grants Defendants' Request for Judicial Notice as to all documents relied on or referred to in the Consolidated Complaint.

disclosure, Peevey's home was searched as part of an Attorney General investigation and notes of the Warsaw meeting were found, although the contents of the notes were not disclosed until April 2015, shortly after Edison and the Attorney General provided them to the CPUC. (CDC ¶¶ 52, 63-65.) This prompted a demand by the CPUC on April 14, 2015 for Edison to produce more documents related to settlement discussions. (CDC ¶ 66.)

On April 29, 2015, Edison produced many documents in response to the April 14, 2015 Order and more documents in response to further ALJ orders. (CDC ¶¶ 73-83.) Included in the document productions was a June 6, 2013 email from Defendant Theodore Craver, Edison's CEO, President, and Board Chair, to Board members Jagjeet Bindra, Richard Schlosberg, Peter Taylor, and Brett White that notes two phone calls between Craver and Peevey. (CDC ¶ 75.) The email notes the initial call was interrupted, prompting a second call. (*Id.*) These calls were not found to be reportable in the ALJ's August 5, 2015 Order or the CPUC's December 3, 2015 decision. (RJN Exs. E & G.) The ALJ's August 5, 2015 Order explained that they were not reportable because they conveyed only "the objective fact that SCE would permanently shut down SONGS." (RJN Ex. E at 241-42.) Also produced was a declaration from Pickett disclosing that he briefed Craver and three SCE executives on the Warsaw meeting and followed up with an email summarizing the elements of a possible settlement if SONGS was permanently shut down. (CDC ¶ 74.)[5] Another declaration from Litzinger revealed a meeting with Peevey and CPUC Commissioner Michael Florio on May 2, 2014 in which Plaintiffs allege that

---

[5] Under the CPUC's rules, communications between an interested party and a CPUC decisionmaker are not entirely prohibited. Procedural inquiries about scheduling, filing deadlines and the like are not required to be reported. However, if they are substantive, they must be reported. Additionally, as explained in both the ALJ's August 5, 2015 Order and the CPUC's December 3, 2015 decision, one-way communications by a decisionmaker to a party are not reportable ex parte communications, but might become reportable depending on the response from the party.

Peevey conveyed that he was pleased with the settlement, but noted the GHG Initiative was not included. (CDC ¶ 77.)

On August 5, 2015, the ALJ issued an Order requiring Edison to show cause why it should not be found in violation of the CPUC rules on ex parte communications for ten ex parte communications that were not timely reported. (CDC ¶¶ 84-88.) Two of the identified communications related to the GHG Initiative and occurred before the CPUCs September 2014 request to add the GHG Initiative to the settlement. (CDC ¶ 86.) On October 27, 2015, a proposed ruling from the ALJ affirmed eight violations of CPUC rules and imposed a $16.7 million fine, $16.5 million of which was attributable to the March 26, 2013 Warsaw meeting. (CDC ¶¶ 93-101.) None of the identified unreported reportable ex parte communications involved any director other than Craver. The CPUC's December 3, 2015 decision formally adopted the ALJ's ruling. (RJN, Ex. G.) The decision noted the prejudice to the other parties in not knowing that Peevey and some at SCE were considering a shut down and allocation of the costs of it, as well as Peevey's advocacy for the GHG Initiative, when others were in the dark about it. (*Id.* at 309.) The decision also found SCE's oversight of its executives' contacts with CPUC decisionmakers was lax and required Edison to develop a public website to track all non-public communications by SCE representatives with CPUC decisionmakers. (*Id.* at 271, 309.) These and other disclosures prompted the other parties to the settlement to seek sanctions against Edison and request the CPUC modify or overturn the settlement. (CDC ¶¶ 89, 102.)

Although not included in the operative complaint, Plaintiffs additionally assert in their Opposition that an unsealed search warrant reflects that the Attorney General believed that Peevey used his position to influence SCE to include the GHG Initiative, Pickett and Peevey knowingly conspired to engage in ex parte communications about the SONGS OII to SCE's advantage, and that the Attorney General was investigating felony charges. (Pls.' Opp'n, Declaration of Eric Zagar, Ex. 1.)

# DISCUSSION

The Court finds Plaintiffs have failed to sufficiently plead demand futility because the allegations of the Consolidated Complaint do not create a reasonable doubt that a majority of the Board (5 of 9) faced a substantial likelihood of liability for the unreported reportable ex parte communications that occurred or for adopting the GHG Initiative. There are no particularized facts showing a majority of the Board even knew about the unreported ex parte communications or knew that there was anything improper about the GHG Initiative.

A derivative action is an "extraordinary process" in which the court permits a shareholder to "step into the corporation's shoes and to seek in its right the restitution he could not demand in his own." *Quinn v. Anvil Corp.*, 620 F.3d 1005, 1012 (9th Cir. 2011). "The normal rule is that a company is run by its management, and the corporation itself has the right to make claims." *Id.* at 1011. Accordingly, a shareholder is required to demonstrate "strict compliance" with both federal procedural requirements and the applicable substantive law before he is able to "wrest control" from the board of directors. *Potter v. Hughes*, 546 F.3d 1051, 1058 (9th Cir. 2008). This threshold requirement to pursue a derivative action exists "to implement 'the basic principle of corporate governance that the decisions of a corporation — including the decision to initiate litigation — should be made by the board of directors or the majority of shareholders.'" *Rosenbloom v. Pyott*, 765 F.3d 1137, 1148 (9th Cir. 2014).

Under Federal Rule of Civil Procedure 23.1, a shareholder who seeks to bring a derivative suit must either first demand action from the board, or "plead with particularity the reasons why such demand would have been futile." *Id.* at 1148 (quoting *In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 989 (9th Cir. 1999), abrogated on other grounds by *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 322-24 (2007)). "[T]he substantive law which determines whether demand is, in fact, futile is provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief." *Id.* The Court

agrees with the parties that in this case California law controls the demand futility analysis and that California law follows Delaware law on demand futility.

## I. Demand Futility Tests

The parties both acknowledge the *Rales* and *Aronson* tests that have developed under Delaware law to evaluate demand futility. *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993); *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984). In Defendants' Motion to Dismiss, they argue the *Rales* test applies because Plaintiffs do not allege any decision by the Board. Rather, Plaintiffs allege the Board failed to act regarding the reporting of ex parte communications. The *Rales* test is applied when the "directors have made no decision relating to the subject of the derivative suit," including "where the subject of the derivative suit is not a business decision of the board." *Rales*, 634 A.2d 927, 933-34. Under the *Rales* test "a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Id.* at 934.

Plaintiffs argue in Opposition that the *Aronson* test applies because the decision to approve the settlement, that included the GHG Initiative, was a Board decision. The *Aronson* test applies "[w]hen a shareholder challenges a decision of a board of directors." *Rosenbloom*, 765 F.3d at 1149. Under the *Aronson* test, the Court must determine "whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Aronson*, 473 A.2d at 814.

However, Plaintiffs go on to argue that it does not matter which is applied because the Ninth Circuit recently explained that in some cases it does not matter whether *Aronson* or *Rales* applies [because] under either approach, demand is excused if Plaintiffs' particularized allegations create a reasonable doubt as to whether a majority of the board

of directors faces a substantial likelihood of personal liability for breaching the duty of loyalty." *Rosenbloom*, 765 F.3d at 1150.[6] "The duty of loyalty, in turn, is violated 'where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities and failing to discharge the non-exculpable fiduciary duty of loyalty in good faith.'" *Id.* "If a majority of the Board had actual or constructive knowledge of violations of the law [as Plaintiffs argue here] and did nothing, it violated its duty of loyalty and faces a substantial likelihood of liability." *Id.* at 1151.

The Court finds that the allegations "do not create a reasonable doubt as to whether a majority of the board of directors faces a substantial likelihood of personal liability for breaching the duty of loyalty." *Id.* at 1050. Additionally, the allegations do not support demand futility under the *Aronson* or *Rales* test because the Consolidated Complaint lacks nonconclusory allegations that a majority of the Board even knew about or should have known about the unreported reportable ex parte communications or knew there was anything wrong with approving the GHG Initiative requested by the CPUC and approved by all other parties to the settlement.

Additionally, Plaintiffs do not dispute that, in determining liability, the Court takes into consideration the exculpatory provisions in Edison's certificate of incorporation subject to the limitations in California Corporations Code § 204(a)(10). As Plaintiffs note, the exculpatory provisions limit the Board's liability to "intentional misconduct, knowing violations of the law, [and/or] bad faith actions." (Pls.' Opp'n at 22 (quoting *Gordon v. Bindra*, Case No. 2:14-cv-1058-ODW (ASx), 2014 WL 2533798, *5 (C.D. Cal. June 5, 2014)).[7] Plaintiffs must plead a "nonexculpated claim against the directors based on particularized facts." *Gordon*, 2014 WL 2533798, *5.

---

[6] In Reply, Defendants do not specifically address the issue, but state this standard in arguing the deficiency of Plaintiffs' allegations.

[7] Although the Court notes the applicability of the exculpatory provision, the allegations of the Consolidated Complaint would be insufficient without it.

## II.  Ex Parte Communications

Plaintiffs argue that eight directors[8] "face[d] a substantial likelihood of liability because they consciously permitted Edison, via an ex parte conspiracy and a $2[0] million kickback to influence the outcome of the SONGS OII." (Pls.' Opp'n. 14.) There are no allegations from which the Court can infer these eight directors knew about the unreported reportable ex parte communications or knew that there was anything improper about the $20 million research funding the CPUC requested that the parties to the settlement include and approve.

Plaintiffs rely heavily on *Rosenbloom*,[9] a case in which the complaint alleged that a drug company's "Board either knew or, due to a series of red flags, should have known, about" the company's illegal off-label marketing and promotion of a drug. 765 F.3d at 1151. In this case, the alleged comparable conduct to the illegal off-labeling pursuits are the unreported reportable ex parte communications with the CPUC concerning SONGS and approval of the GHG Initiative. In *Rosenbloom*, the plaintiffs alleged more than ten years of the Board actively developing multiple strategic plans to maximize sales of a drug for off-label use, closely monitoring those sales, and even acquiring another company to increase those sales. *Id.* at 1151-52. The complaint contained very detailed factual

---

[8] The Court need not address the allegations specific to Craver because Plaintiffs' have not sufficiently alleged demand futility as to the other directors as would be necessary for demand to be futile as to a majority of the Board. Additionally, the Court finds that Taylor's alleged association with UCLA does not appear to be distinguishable from "[a] director's association with a company that does business with the corporation [that] does not in and of itself establish a lack of independence." *Katz v. Chevron Corp.*, 22 Cal. App. 4th 1352, 1368 (1st Dist. 1994).

[9] Because Plaintiffs' briefing relies heavily on *Rosenbloom* and advocates the application of the consolidated test outlined in it, the Court considers the sufficiency of the allegations of the Consolidated Complaint in light of that decision and its guidance on evaluating demand futility. However, the Court notes that it is not finding that the "battery of particularized factual allegations" in that case are the minimum necessary to plead demand futility. *Rosenbloom*, 765 F.3d at 1152.

allegations from which the court could infer that the Board knew about illegal activities. *Id.* at 1152. There were allegations the Board was shown a slide show for a program to market and promote the drug for a specific off-label use that the Board knew clinical trials did not support and for which "FDA approval was nowhere in sight;" allegations the Board reviewed promotional documents for a program to help physicians obtain reimbursements for off-label uses; and allegations the Board received a report on a program to persuade doctors to prescribe the drug for an off-label purpose while reporting it with an on-label diagnosis. *Id.* And, critically different from the allegations here, there were allegations "the Board received repeated FDA warnings, [letters annually for five years], about illegal promotion," including one that "specifically addressed off-label promotion," and allegations an employee filed an ethics complaint about off-label promotion and then resigned. *Id.* at 1153-54. Despite knowledge of the conduct and warnings from the FDA, the Board did not nothing. *Id.* at 1159. The allegations here are drastically different.

Here, the Consolidated Complaint does not allege facts from which the Court could infer a majority of the Board[10] approved of any conspiracy to engage in unreported reportable ex parte communications because there are no allegations from which the Court can infer these eight directors even knew about the unreported reportable ex parte communications.[11] In *Rosenbloom*, there were a series of red flags over years that should have alerted the Board to illegal activities. The allegations Plaintiffs emphasize as red flags

---

[10] The Court's references to "the Board" here are intended to encompass the eight directors other than Craver. As previously noted, the Court need not address the sufficiency of the allegations as to Craver because Plaintiffs have not met the pleading requirements as to the other eight directors.

[11] In summarizing the allegations of the Consolidated Complaint, Plaintiffs assert, without citation to the Complaint or any facts in support that Board members "knowingly permitted the Company to embark on a secret campaign to improperly manipulate the SONGS settlement through backdoor communications with CPUC leaders." (Pls.' Opp'n 5.) As discussed more fully below, there are no allegations that support this conclusion.

that should have alerted the eight directors to the unreported reportable ex parte communications are not red flags because they either do not alert the eight directors to any actual wrongdoing or lack any factual support that any of the eight directors were aware of them.

The June 6, 2013 email from Craver to four other directors — that Plaintiffs describe as improper and argue was a sign that Edison's compliance with the CPUC rules was inadequate — was not even a reportable ex parte communication.  Both the ALJ and the CPUC decisions found it was not reportable because Craver was only calling to notify Peevey that Edison had decided to permanently shut down SONGS.[12]

The September 25, 2014 email to Company employees reminding them of the ex parte rules and referencing "a situation" that "makes clear that awareness is not enough" also lacks any allegations suggesting the Board members were aware of it.  (CDC ¶ 44.) Even assuming the Board would have interpreted it as a sign of an internal problem rather than as a reference to problems at PG&E, there are no allegations the Board received or even knew about this email.

Unlike *Rosenbloom*, there are no allegations of a series of FDA letters and complaints from physicians and employees about wrongdoing. Plaintiffs attempt to characterize this as a widespread scheme of wrongdoing that should have been obvious because resolution of the SONGS OII was of critical importance.  And while Plaintiffs have alleged that the resolution of the SONGS OII was very important, there are no red flags allege, let alone a series of them, that could have drawn the Board's attention to the unreported reportable ex parte communications.  The Court cannot infer that a majority of the Board knew about or should have known about the violations and did nothing, as

---

[12] The Court is not endorsing such communications, but Plaintiffs cannot simply describe the calls as improper without any indication why, particularly in the face of a CPUC decision finding they were not, and then expect the Court to find it was a warning to the Board that its compliance was inadequate or something improper was happening.

required to create a reasonable doubt that the Board faced a substantial likelihood of liability.

### III. GHG Initiative

Plaintiffs also argue that demand is excused as to the entire Board because the Board approved the $20 million GHG Initiative, but there are no facts from which the Court can infer the eight directors other than Craver knew or had reason to know the GHG was anything but a settlement modification requested by the CPUC. The parties' initial settlement was submitted to the CPUC for approval. The CPUC then issued a request that the parties approve a modification to the settlement adding the GHG Initiative. All parties, including Edison, by a vote of its Board, approved it. There are allegations in the Consolidated Complaint that Peevey sought this funding, but there are no allegations that these eight directors knew that or should have deduced as much.

In summarizing the allegations of the Consolidated Complaint in their Opposition, Plaintiffs assert, without citation, that the Board knew the GHG Initiative was a kickback to Peevey to obtain a favorable resolution of the OII. (Pls.' Opp'n 3-4.) Similarly, in arguing the Board knew "that the payment was a kickback," Plaintiffs cite numerous paragraphs of the Consolidated Complaint, (Pls.' Opp'n 18 n.10), but none of those allegations convey how any Board member other than Craver would have known there was anything improper about this request from the CPUC. The allegations that the eight directors knew it was a kickback are conclusory and have no support in the allegations of the Consolidated Complaint. Even taking into account Plaintiffs' new allegations raised for the first time in their Opposition — that Litzinger was being pressured by Peevey on the GHG Initiative, that Peevey indicated he was going over him to Craver, and that Peevey did go to Craver — those facts only support the inference that *Craver* knew that Peevey wanted the GHG Initiative in the settlement. Assuming this constituted knowledge the GHG Initiative was a kickback to Peevey for his support of the settlement, there are still no allegations to support that conclusory assertion as to the other eight directors. In

pleading demand futility, a plaintiff must allege "facts specific to each director from which it can conclude that that particular director could or could not be expected to fairly evaluate the claims of the shareholder plaintiff." *Potter*, 546 F.3d at 1058 (quoting *Shields v. Singleton*, 15 Cal. App. 4th 1611, 1622 (2nd Dist. 1993)).

Plaintiffs' allegations fail to create a reasonable doubt that a majority of the Board faced a substantial likelihood of liability. There are no allegations from which the Court can infer a majority of the Board knew or should have known about the unreported reportable ex parte communications or about Peevey's pursuit of inclusion of the GHG Initiative. *See Rosenbloom*, 765 F.3d at 1159 (finding plaintiffs allegations showed "that either the Board did nothing despite actual or constructive knowledge of wrongdoing . . . or knowingly adopted a business plan premised on illegal conduct).

**IV.   Audit Committee**

Plaintiffs argue that the members of the Board that served on the Audit Committee either knew about the unreported reportable ex parte communications in their role as Audit Committee members or breached their fiduciary duties by failing to respond appropriately to red flags. The critical difference in this case, from those Plaintiffs rely on, is red flags. As discussed above, Plaintiffs have not alleged "that an audit committee . . . had notice of serious misconduct and simply failed to investigate," *Rosenbloom*, 765 F.3d at 1154, or that "beyond the directors' membership in the Audit Committee, they *knew of* the" unreported reportable ex parte communications or Peevey's pursuit of the GHG Initiative. *In re Intuitive Surgical S'holder Derivative Litig.*, 146 F. Supp. 3d 1106, 1121 (N.D. Cal. November 16, 2015) (emphasis added).

Plaintiffs additionally argue that the Audit Committee members failed to ensure appropriate internal controls were in place. Defendants accurately note this is a *Caremark* claim which requires a plaintiff plead "(a) the directors utterly failed to implement any reporting or information systems or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves

from being informed of risks or problems requiring attention." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (2006) (referencing *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996)).  There are no allegations that there were no reporting or information systems or controls.  And, as discussed above, there are no allegations that constitute the sort of disregarded red flags from which the Court could infer the Audit Committee failed to monitor or oversee operations.

## CONCLUSION

Defendants Motion to Dismiss is **GRANTED**.  Plaintiffs are granted leave to file an amended complaint.  If Plaintiffs elect to file an amended complaint, it must be filed within 21 days of the filing of this Order.

**IT IS SO ORDERED.**

Dated:  September 14, 2016

_____
Hon. Roger T. Benitez
United States District Judge